INHABITANTS OF CALAIS *versus* INHABITANTS OF MARSHFIELD.

30    511
106   397

Where a pauper, belonging to another place, is supplied within and at the expense of the plaintiff town, under a contract made with an individual to support all such paupers as the town should be obliged to support, such supplies are held to be furnished by the town.

In such case the plaintiff town may maintain an action for such supplies, against the town of the pauper's settlement, although the recovery is for the benefit of the contractor.

A residence by a father, within the United States, and an adherence to its government, from the commencement of the Revolutionary war till after the definitive treaty of peace in 1783, conferred all the rights of citizenship, both upon himself and upon his minor child residing in his family.

By the common law, allegiance is not a matter of individual choice. It attaches at the time and on account of birth, under circumstances in which the family owes allegiance and is entitled to protection.

Although the child, whose citizenship is thus established, may have removed, immediately after coming of age to act for himself, into a British province, and adhered to its government, he is, on his return to the United States, entitled to the rights of citizenship.

By the act of 1826, dividing the town of Machias into several towns, a person, born within its territorial limits, though prior to its incorporation, and removed therefrom at the time of said division, is held to have a settlement

in that one of the towns, within the territorial limits of which he was born. And this rule applies to persons whose settlement there was merely derivative.

Assumpsit, for the support of William B. Scott and his family, alleged to be paupers.

The case came before the Court upon the following facts.

Scott was born in 1774, in that part of the town of Machias, which, on the division of that town in 1826, was incorporated into the present town of East Machias. When he was seven years old, his father, John Scott, removed with his family, including the pauper, to the territory, (a part of the original town of Machias,) afterwards incorporated as Marshfield; and resided and paid taxes there until the year 1810, when he removed to the province of New Brunswick, where he died in 1824; William P. Scott resided in said part of Machias, now Marshfield, until he was between 21 and 22 years of age, when he removed to the province of New Brunswick, where he resided until the winter of 1846, when he removed to Calais, where he has since lived and been supported as a pauper. While in the province of New Brunswick, the pauper became the owner of the farm upon which he lived, and to which he still sets up a claim, which is in a course of litigation; he performed military duty there; and held once or more the office of surveyor of the highways; he also voted there, his right not having been questioned.

At the time of the support, furnished the pauper, the town of Calais was under a contract with Thomas Paine, for the support, at a fixed price, of such paupers as said town might be obliged to support, or whom the overseers should direct to be supported as paupers.

Due notice was given by the plaintiffs to the defendants, and a seasonable answer was returned denying the settlement of the paupers in Marshfield.

The case was submitted upon the legal rights of the parties.

The inhabitants of East Machias, being supposed to have a possible interest, in the subject matter of the suit, their counsel was admitted to argue the cause in their behalf.

*G. F. Talbot*, for East Machias.

1. The right to recover for the support of paupers, having settlements in other towns, is derived solely from the statute, and is based upon expenses, *actually incurred.* But the plaintiffs were indemnified by their contract with Paine.

2. The pauper is an alien, and has no settlement within the State. *Inglis* v. *The Trustees of the Sailor's Snug Harbor*, 3 Peters, 126. He was born under the allegiance of Great Britain, and on attaining his majority, he made his election to return to that allegiance.

3. If the pauper have a settlement within the State, it is not at East Machias, but at Marshfield, by the provisions of the statute of 1793, and by the provisions of that of 1821; and by those of the Revised Statutes.

4. In 1826, the original town of Machias was divided into three towns. The pauper had, through his father, gained a legal settlement in the original town.

When, in 1846, the town of Marshfield was incorporated out of Machias, the pauper's last dwelling place fell within the limits of Marshfield, and that town became chargeable with his support. Nor is the place of his legal settlement changed by the provisions of the 5th section of the act of 1826, dividing the old town of Machias, and incorporating the towns of West Machias, (now Machias,) East Machias and Machiasport. The provisions of that section apply only to those persons, who had "a settlement in Machias." The pauper in the present case had no such settlement, and could gain none in his own right; he could only gain one through his father. *Princeton* v. *West Boylston*, 15 Mass. 257; *Southbridge* v. *Charlton*, ib. 248; *Westboro'* v. *Franklin*, ib. 254.

The claim that W. P. Scott is settled in East Machias, is strongly resisted by the consideration, that it separates his settlement not only from that of his father, but also from that of his wife and children. But in any view there is no pretence that his daughters, (for whose support this action in part was brought,) can have any settlement in East Machias.

*F. A. Pike,* for plaintiffs.

One objection raised to the maintenance of this action is, that the pauper, W. P. Scott, is an alien.

The right of choice, in case of a revolution like that of 1776, is granted ; but that right must be exercised during the pendency of the contest or immediately upon its conclusion. *Inglis* v. *Sailor's Snug Harbor,* 3 Peters, 199 ; *Killam* v. *Ward,* 2 Mass. 236 ; 2 Kent's Com. 60.

If, at the time the choice should have been made, W. P. Scott was incapacitated on account of minority, then his father had authority to choose for him.

But W. P. Scott did not *immediately* upon attaining his majority, go into the province. Nor does it appear what his *intentions* were at the time he went.

It is no consequence whether he is an alien or not. His father was a citizen, and that is sufficient to give his son a settlement here.

An alien is capable of acquiring a settlement in this State, under the provisions of statute 1821, chap. 122. *Knox* v. *Waldoboro',* 3 Greenl. 455.

The next question is, whether Marshfield or East Machias is responsible for the support of the paupers.

When W. P. Scott, in 1795, removed from Machias, viz. that part of it now constituting the town of East Machias, the Massachusetts settlement act of 1794 was in force ; and by the terms of that act, he had gained no settlement anywhere *in his own right.*

The only question then to be determined is, where his father's place of settlement was.

The father's settlement would be in Marshfield under two rules of the act of 1794.

1. He lived there in 1784 at the time of the incorporation of the town of Machias.

2. He lived there and paid taxes there for sixteen years after the passage of the settlement act of 1794.

By the act of 1846, dividing Machias into Machias and Marshfield, his settlement was thrown into Marshfield. And

Wm. P. Scott, having no settlement in his own right, and consequently following that of his father, has his settlement in Marshfield ; unless the act of 1826, dividing the town of Machias, made a disposition of him other than that which the general law as above cited makes. Sect. 5 of that act is : — " All persons, now chargeable to said town of Machias, as paupers, and all persons, who having a settlement in Machias, but removed therefrom, and not having gained a settlement elsewhere, shall hereafter become chargeable as paupers, shall, *if born in Machias,* have their settlement in that town within the limits of which they were born, *and if not born in Machias, shall have their settlement in that town in which they have usually resided.*"

The several reasons why this section does not apply to the case at bar, are sufficiently stated in the argument of counsel for East Machias.

*R. K. & C. W. Porter,* for defendants.

SHEPLEY, C. J. — The action appears to have been commenced to recover compensation for supplies furnished to William P. Scott, his wife, and two of his daughters, as paupers alleged to have a legal settlement in the town of Marshfield. The case is presented upon an agreed statement, which has no direct bearing upon the settlement of any of the paupers except that of William P. Scott, and his settlement alone will be examined.

The first objection made to the plaintiff's right to recover, is, that the supplies do not appear to have been furnished by the plaintiffs. It is admitted, that Scott has been supported in the town of Calais, as a pauper, since the winter of 1846. At the time, when the supplies were furnished, Thomas Paine was obliged by a written contract to support all the paupers of that town for an agreed compensation. It is not denied, that the supplies were necessary. Paine was to support all paupers " whom said inhabitants may be obliged to support, and whom the overseers of the town shall direct to be supported as paupers." Although it is not stated, that the overseers

ordered, that the supplies should be furnished or the paupers supported, yet such may be the correct inference from the facts agreed. The supplies in such case would not be the less furnished by the town, because they were paid for by it as included in a gross sum, paid for the support of all its paupers. It might be more difficult to ascertain the amount expended for a particular pauper, as it would also be in towns, in which the paupers are not supported by a contract, but in a workhouse, by a supply furnished for the whole number and not for each individual or family. Nor will the fact, that Paine may by his contract be entitled to the benefit of the amount, that may be recovered, preclude the plaintiffs from maintaining the action. They are not the less entitled to recover the amount expended, because they have agreed to pay it to another, who by an agreement made with them has furnished the supplies.

The second objection is, that the pauper can have no legal settlement in this State, because he is an alien. His father appears to have resided in the town of Machias from the year 1774 to the year 1810, when he removed to the province of New Brunswick. There can be no doubt, that he was a citizen of the United States. The pauper was born in the year 1774, and continued to reside in the family of his father until after he became of full age, and he soon after, in the year 1795, removed to the province of New Brunswick, where he continued to reside until the year 1846, when he removed to Calais. While residing in that province he became the owner of real estate there, performed military duty, held the office of surveyor of highways, and exercised the elective franchise.

Upon the separation of the United States from Great Britain, by revolution, those persons, who remained and adhered to the newly established government, are regarded as having renounced their allegiance to their former sovereign, and as having yielded it to the government of their choice; and to have done this not only for themselves but for their minor children, being then members of their family. Massachusetts, by the act against treason, passed in the year 1777, claimed

allegiance from all persons abiding within the State and deriving protection from its laws. In the United States it is the established doctrine, that those who remained in the country after the declaration of its independence, in 1776, and adhered to its government, became citizens of the United States. It is the established doctrine in Great Britain, that she relinquished by the treaty of peace of 1783, all claim to the allegiance of all her former subjects, who were at that time domiciled in and adhering to the government of the United States. *Thomas* v. *Acklam,* 2 B. & C. 779. The act of Congress, of the year 1802, c. 28, § 4, provides, that the children of persons, who then were citizens of the United States, should be considered citizens of the United States, although born out of their limits.

The allegiance of the pauper would seem, therefore, to have been relinquished by his former sovereign, and to have been claimed by the government of the State, in which he continued to reside in a family adhering to it. And his citizenship to have been subsequently admitted by an enactment of the United States.

But it is said, that soon after he became of an age to act for himself, he elected to continue to adhere to the government and allegiance, to which he was by birth entitled. By the common law, allegiance is not a matter of individual choice. It attaches at the time and on account of birth under circumstances, in which the family owes allegiance, and is entitled to protection. The parent has a right to determine, where his family shall reside, and his and its relations to the government, under which he lives. This is the foundation of the doctrine, that by a change of the father's allegiance by naturalization or otherwise, the allegiance and citizenship of his minor children, then members of his family, becomes changed. The rights and duties of such minor children are thus necessarily determined. If the father of the pauper had deceased, when the pauper was but twenty years of age, leaving an estate, can there be a doubt, that the pauper must have been regarded as a citizen, and as entitled to a share of that estate by inherit-

ance ? If this must be conceded, then an election after he became of age to be a subject of Great Britain, could be no more than an election to renounce a citizenship admitted by our laws, and to adopt the allegiance due at the time of his birth. Admitting that the facts agreed would prove, that he made such an election, and that he was correctly regarded as a British subject, that would not necessarily make him an alien. The laws of the United States determine, what persons shall be regarded as citizens irrespective of such person's pleasure. Accordingly the act of Congress before named, has been considered as determining, that persons were entitled to be regarded as citizens, who were born and had ever continued to reside without the limits of the United States, being the children of citizens ; and such persons might at the same time be the subjects owing allegiance to the government of the country, in which they were born. *Charles* v. *Monson and Brimfield Man. Co.* 17 Pick. 76. Mr. Justice STORY, in his elaborate opinion in the case of *Inglis* v. *The Trustees of the Sailor's Snug Harbor,* 3 Peters, 157, says, " it [the government] may give him the privileges of a subject, but it does not follow, that it can compulsively oblige him to renounce his former allegiance." He further says, on page 162, " the ground of this doctrine is, that each government had a right to decide for itself, who should be admitted or deemed citizens; that those, who adhered to the States and to Great Britain respectively, were by the respective governments, deemed members thereof; and that the treaty of peace acted by necessary implication upon the existing state of things, and fixed the final allegiance of the parties on each side, as it was then *de facto.* Hence the recognition on the part of Great Britain, of our independence, by the treaty of 1783, has always been held by us as a complete renunciation on her part, of the then members of the United States, whether natives, or British born." The opinion of a majority of the Court in the same case, as delivered by Mr. Justice THOMPSON, speaking of the demandant in that case, says, " and his election and character followed that of his father, subject to the right of disaffirmance in a reason-

able time after the termination of his minority." If the treaty of peace of 1783, be regarded by both countries as making by Great Britain a renunciation, and by the United States an acknowledgment of due allegiance of all the people, who then resided in the United States and adhered to its government, it is difficult to perceive how a minor, then and for a long number of years afterward, residing in the family of his father in this country, could by such an election, owe or be entitled to the benefits of an allegiance before renounced by that government without some new act of such government to recognize it. Mr. Justice Story does not appear to have assented to the position, that a minor may make an election many years after the contest had been finally settled, and the rights of the respective adherents had been determined by their respective governments, and thereby determine, what shall be the rights and duties of those governments respecting his allegiance. He says on page 171, "that if the demandant's father was at that time so adhering, it was a final settlement of his allegiance on the British side." By the cession of a part of one country to another, obtained by purchase or by conquest, the allegiance of all the inhabitants residing upon it as citizens or subjects, is transferred from the ceding to the accepting government, except so far as the compact of session may otherwise provide. The allegiance of the adult and of the minor, is in such case alike transferred without its consent, and it may be much against his pleasure. Upon what principle is the treaty of peace of 1783 less operative and effectual, especially upon the views of right taken and held by Great Britain, in that controversy and in its settlement?

But it is not necessary for the decision of this case to determine, whether an election made by the pauper on his coming of age would secure to him all the rights of a liege subject of Great Britain, for if that be admitted, he must still be regarded as entitled by the laws of the United States, to the benefits of citizenship; because it could not have been the intention by the act of Congress of 1802, to admit the children of its citizens, which were born out of the limits of the government, to

be citizens, while children of the same parents born within its limits, were denied to be citizens.

Although the government of one country may grant to persons owing allegiance to that of another, the rights and privileges of citizenship, it is not intended to intimate, that the government making such grant would thereby and without their consent or change of domicile become entitled to their allegiance in respect to any of their political duties or relations.

An alien, according to the provisions of our statutes may gain a settlement in this State. *Knox* v. *Waldoboro'*, 3 Greenl. 455. And there is nothing found there to create a forfeiture of a legal settlement once gained, or to deprive the person of its benefit, while his domicile is established within the State, in consequence of his having become the citizen or subject of a foreign government.

If the pauper had the capacity to gain a legal settlement in this State, the question remains for consideration, whether he has such a settlement in Marshfield. His father had a legal settlement in the town of Machias before it was divided into three towns, in the year 1826. He had before that time removed from that town. His residence at the time of the pauper's birth was established in that part of the town, which upon the division was incorporated as East Machias. About the year 1781, he removed and established his residence in that part of the town, which was upon the division incorporated as West Machias; and into that part of it, which was in the year 1846, incorporated as Marshfield, where he continued to reside until the year 1810. While the father had a settlement in the town of Machias it was not confined to or fixed upon any particular part of it, by his residence in that part. Upon a division of the town some statute provision, either general or special, relating to the subject, must determine to which of the new towns his settlement should be attached. By the statute then in force, c. 122, § 2, provision was made, that upon division of towns a person having a legal settlement therein, but removed therefrom, " shall have

a legal settlement in that town, where his former dwelling-place or home shall happen to fall upon such division." By this provision the settlement of the father would become attached to West Machias. The act approved on June 30, 1846, dividing the town of Machias, formerly called West Machias, into the towns of Machias and Marshfield, provides, that Marshfield shall be liable for the support of all persons, "who, having gained a settlement in said Machias, have usually resided within the limits of Marshfield." This clause might be sufficient to transfer the settlement of the father to Marshfield. The pauper, by the provisions of the general statute, followed and had the settlement of his father in the town of Machias, and unless there be some special provision to determine otherwise, he will follow that settlement to the town to which it has become attached. But it is competent for the Legislature to make other and different provisions respecting the burdens to be imposed upon the respective towns incorporated on the division of a town. The fifth section of the act of 1826, dividing the town of Machias, provides, that " all persons, who having a legal settlement in Machias, but removed therefrom and not having gained a settlement elsewhere, shall thereafter become chargeable as paupers, shall if born in Machias have their settlement in that town, within the limits of which they were born ; and if not born in Machias, shall have their settlement in the town, where they have usually resided." This determined the settlement of those, who were born in Machias and had removed, to be not in the town, where their former dwelling-place fell according to the provisions of the general act, but in the town, within the limits of which they were born. The pauper, it is said, was not born in Machias although born within the limits of that town before it was incorporated. Such a construction of the act cannot be admitted. The paupers were to " have their settlement in that town within the limits of which they were born ;" and the phrase, " if born in Machias," had reference to the same class of persons. It clearly was not the intention to make the settlement depend upon the fact of their being

born in an incorporated town, but upon their being born within certain limits.

It is further insisted, that the provisions of that act " have no application to persons whose settlement is only derivative." The act in terms comprehends all persons " having a settlement in Machias, but removed therefrom," without making any distinction respecting the mode by which it had been gained. The pauper at that time had a legal settlement in Machias, and it was not the less his settlement, because it had been acquired by the provisions of the general law, that legitimate children should follow and have the settlement of their father. Having such a settlement, that, with the burden of his support in case of need, was, by the terms of the act, assigned to that one of the towns, within the limits of which he was born.

It is further insisted, that this effect cannot be given to the act, because thereby a minor child might have a settlement in one town and his parents in another, and that this would violate a well established rule, " that the wife cannot have a settlement separate from her husband, nor the minor children a settlement distinct from that of their father." That rule, as a general one, would be the necessary result of the general statute provisions, that married women shall follow and have the settlement of their husbands, and that legitimate children shall follow and have the settlement of their fathers. But when the Legislature by special enactments establishes rules respecting the settlement of a particular class of paupers, differing from those contained in the general statute provisions, the rules of construction applicable to those general provisions cannot be applied to such special enactments, when by doing so the Court must do violence to language clearly exhibiting the intention of the Legislature. The rule insisted upon does not always prevent minor children from having a settlement in a different town from that in which their parents have a legal settlement. It has been decided, that children, who during their minority had been emancipated, would not follow and have the settlement of the parent, acquired after

emancipation. *Springfield* v. *Willbraham,* 4 Mass. 493 ; *Charlestown* v. *Boston,* 13 Mass. 469 ; *Lubec* v. *Eastport,* 3 Greenl. 220.

If the Court could perceive, that a literal and fair construction of a special act would have the effect to break up a large number of families and to separate the minor children from their parents, when they were in need of supplies, there would be just reason to doubt, whether such could have been the intention, and whether a forced construction, should not rather be adopted. But when there is perceived to be only a possibility, that such a result may take place only in the few families, upon which the special enactments can operate, the Court would not be authorized to adopt a construction at variance with the literal import of the language. As the pauper does not appear to have a legal settlement in Marshfield, there must, according to the agreement of the parties, be an entry of                              *Plaintiffs nonsuit.*