THE TOWN OF LYNDON *v.* THE TOWN OF DANVILLE, *Aplt.*

### Settlement of alien born paupers.

An alien born does not have the settlement in this state which his father once had, if, before his birth, the father removed into the foreign jurisdiction where the child was born and never afterwards returned from it.

APPEAL from an order of removal of Israel Chamberlin, a pauper, from the town of Lyndon to the town of Danville. Plea, that the town of Danville was not the place of the pauper's legal settlement. Trial by the court, June Term, 1854,—POLAND, J., presiding,—upon the following case stated.

Ralph Chamberlin, the father of the pauper, was born in Danville, February 27, 1800, and, with his father Caleb Chamberlin, had a legal settlement in that town.

He married Lydia Beebee, at Danville, about the year 1822, and some two years subsequently, removed to Stanstead, in the province of Canada East, where the pauper was born, in the year 1826. When five or six years of age, the pauper was brought by his mother to Lyndon, Vt., and left with the family of a Mr. Ber-

niss. The mother did not return to Canada, but remained mostly in Danville; and, about the year 1850, married her present husband, Mr. Northrup. The pauper's father continued to reside in Stanstead until his death, which occurred about the year 1844. The pauper had no legal settlement in Lyndon. He continued to reside there until 1851, when he removed to Burke, remained there one year, then returned to Lyndon and continued to reside there until his removal in September, 1853.

Upon the foregoing facts, the county court decided that the pauper had a legal settlement in the town of Danville, and was therefore duly removed, to which the said town of Danville excepted.

*T. Howard* for the appellants.

The father and grand-father of the pauper had a legal settlement in Danville. If the father had continued to reside in Danville and the pauper born there, or perhaps if born in Canada, he would have had a settlement by derivation from his father. The father, Ralph Chamberlin, having removed from Danville to Stanstead in Canada, about the year 1824, the pauper was born there in 1826. The event shows that the father removed to Canada with the intent to remain, as he continued to reside in Stanstead until his death some 20 years after. He therefore expatriated himself so far as it was possible for him to do so.

We deny that the son Israel took, at his birth, the settlement his father formerly had in Danville. Such a doctrine involves the proposition that our pauper laws have an extra-territorial operation, not only beyond the state, but beyond the United States; and this, too, when all the parties are without our jurisdiction, the father an alien by expatriation, and the son by birth; such a proposition is opposed to all analogy and all sound principle.

But it is urged that the father having once had a settlement in Danville, *that* settlement continued until displaced by a settlement gained in some other town in Vermont, and that our courts take no notice of a settlement acquired abroad, as decided in *Georgia* v. *Grand Isle*, 1 Vt. 464. We do not controvert the doctrine of that case, and perhaps it may be reasonably extented to a settlement in Stanstead or Cuba. A legitimate consequence would be that if

Ralph Chamberlin had returned after any length of time into Vermont, he would have been rehabitated to his former settlement in Danville, and might have been removed thither from any other town. This was precisely the point in the case alluded to. It does not appear, however, that the pauper, in that case, had any family; so nothing is determined in respect to the effect upon his wife or children. There is no doubt the same consequence would result to any child born in Danville before they removed to Stanstead, for the doctrine of *continuando,* is equally applicable to original and derivative settlements. But the case at bar differs very materially from the one referred to. Ralph Chamberlin was fully and completely an alien before and at the time of the birth of the pauper; and if this was not so, the very fact that the pauper was born in a foreign government renders him an alien. If, then, this pauper was an alien, could he, and did he succeed to a settlement in Danville, which his father derived from his grand-father ?—to a settlement which his father had removed from, and abandoned long before the pauper was born ? We insist the father had no such right or benefit to impart to his son; and if he had the right in himself, he certainly had not the power, and neither had our laws the power to impart such right upon one born an alien.

The supreme court of Virginia has decided " that persons born in a foreign country, of parents also born in foreign countries, are not citizens of Virginia, and consequently cannot inherit lands there,, although their grand-mother was a native of Virginia, and removed to England before the revolution, married there, and resided in that country until after the peace, when she returned to Virginia and resided until she died." This is carrying the principle one step further than is asked in this case. United States Digest, Vol. 1, p 134.

An alien cannot, by residence, gain a settlement in this state. Our laws regulating the settlement of paupers, are statutory regulations. They apply to our own state and her paupers, and have no such extraordinary energy and power that they can, and do transmit a settlement, derived from a grand-father, through an alien father, upon an alien son.

*E. A. Cahoon* for the appellees.

Was the pauper, Israel Chamberlin, lawfully removed from Lyndon to Danville?

The pauper had no legal settlement in Lyndon or elsewhere, in his own right; hence he must derive one first from his father, if the father had one in this state. Had his father, Ralph Chamberlin, a settlement in this state? The facts stated, show he had. Therefore the pauper, by the plain and express terms of the statute, was rightfully removed, no matter what may have been the place or circumstances of the pauper's birth, so long as he was legitimate; or where may have been the residence of his father, so long as he gained no other settlement in the state, excepting the one in Danville.

But it is claimed that the pauper, having been born in a foreign jurisdiction, is not a citizen, and therefore can have no settlement in Vermont. Our statute distinctly repudiates such a doctrine. There is no exception where birth occurs in another state or government. Would this be urged against the pauper, had he been born in New Hampshire? Certainly not; and yet it might be done with the same reason as when born in Canada. The laws of pauperism are one thing, and the laws of citizenship or naturalization quite another; they have no connection. The former belong exclusively to the states, and are purely matters of internal police, while the latter are made and regulated by the Federal Government for the union. There are various modes by which persons may acquire legal settlements without reference to citizenship, as by vote of towns admitting one to be an inhabitant; holding for two years certain town offices; having a certain amount of grand list, &c.

But it is not true that the pauper was not a citizen of the United States. He *was* a citizen. By the 4th section of act of congress, passed April 14th, 1802, it is declared, " the children of persons who now are, or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States, provided the right of citizenship shall not descend to persons whose fathers have never resided within the United States;" 2 Kent p. 52.

The pauper's father, being two years of age at the time of the passage of the above act, was of course then a citizen of the Uni-

ted States; for children, or minors, like women, are citizens, both by common law and by acts of congress, though they are not voters. His child, therefore, though born in Canada, was also a citizen of the United States by virtue of the foregoing act of congress.

Even had his father expatriated himself and sworn allegiance to a foreign power, (and it is yet doubtful if he can do this without the consent of this government, which does not appear,) it would not vary the case in the least. The act makes no exceptions for such contingency.

The opinion of the court was delivered, at the circuit session in September, by

REDFIELD, CH. J.   The majority of the judges of the court, all of whom have heard the case, concur in the opinion that an alien born, whose father never comes into the state after the birth of the pauper, does not derive any settlement from his father, although his father, when he left the state, had a settlement in the state. The question is not of any practical importance, the number of cases which it will reach being very few. But if I were to determine it myself, I should give the statute the same operation it has in other cases, and the same which its words imply; i. e. that legitimate children shall have the settlement of their father. Whether this should be extended indefinitely is perhaps questionable. Whether settlements could be derived through aliens who never resided in the state, it is not relevant to inquire. But here the pauper is himself a citizen by the act of 1802, having been born of parents who were citizens before the passing of that act, and he derives his settlement from a father who was born within the state. I think, therefore, that he was properly removed to the settlement of his father. If not, the question might arise, whether he could take the settlement of his mother, she having returned into the state about the time the pauper returned. And embarrassing questions might arise in that view, but the conclusion is that the judgment is reversed, and judgment upon the case stated that the pauper was unduly removed.

The following opinions in this case have been furnished to the reporter by judges ISHAM and BENNETT.

ISHAM, J. The inquiry, in this case, arises, whether the pauper, Israel Chamberlin, had his legal settlement in Danville to which place he was removed by the order of two justices from the town of Lyndon. The Comp. Stat. 128, §1, provides, " that legitmate children shall follow and have the settlement of their father, until they gain a settlement of their own." Upon this provision of the statute this order of removal was made.

Ralph Chamberlin, the father of the pauper, had a legal settlement in Danville. It is not pretended that he or the pauper has ever acquired, in their own right, or in any other manner, a legal settlement in any other town in this state. If the case rested upon those facts alone, it would fall within the express letter of the act; the pauper would have a derivative settlement in Danville from his father, and the order of removal would have been properly made. It appears in the case, however, that Ralph Chamberlin with his family removed from Danville to Stanstead, in the province of Canada, about the year 1824 ; that the pauper was born in that province, and that his father continued to reside there until his decease in 1844. His removal to Canada was not a mere change of domicil with the intention of returning, but a permanent change of his residence from this to a foreign government. So far as he was capable of doing it, it was a renunciation of his duties, obligations, and allegiance to this state and this country. It is unnecessary, in this case, to inquire what relation, after his removal, existed between him and this country, or the government to which he had removed. It may be true, that if at any subsequent time he had returned to this state, his settlement would have continued in Danville, as his relation to the state would have revived and existed the same as if no removal had been made. In that event, his settlement might have been transmitted to his minor children residing with him. But however that may be, the question still remains, can this pauper, under our statute, have a derivative settlement from his father in Danville when his birth was in a foreign country, when his parents were residing there at the time with no intention of returning, and when, too, the residence of the father was continued in that province until his decease.

The intention of the legislature, in the passage of the act in. re-lation to the settlement of paupers, was to make provision for the support of the poor who are inhabitants of and who belong to the state. It is a local regulation, and has no effect except upon those between whom and the state there is that relation which necessa-ily exists between the state and those subject to its government. Foreigners and the inhabitants of other states, who have never had a settlement here, cannot claim the benefit of its provisions, as they owe no duty to the state and the corresponding duty of protection and support is not due from the state to them. The provisions of this statute should be so construed as to meet the ordinary wants of those for whose benefit they were made, and should be extended to no other cases. In the case of *Georgia* v. *Grand Isle*, 1 Vt. 464, it was held that a settlement once obtained in this state was not lost by the subsequent acquisition of a settlement in another state; and such seems to be the. rule in New Hampshire. The mi-nor children of such parents would follow the settlement of their father, though born in another state, if during their minority the father removed into this state. For, in the language of Lord Cran-worth on the subject of derivative settlements in the case of *Adam-son* v. *Barbour*, 28 Law & Eq. 39, " when we ascertain in what soil the root is fixed, we have at once the soil with which the branch. es are connected." That result, Judge Swift also remarks, 2 Swift's Dig. 818, " would seem to follow from the community of privileges between citizens of the several states." There is no disposition to question the doctrine as held in the case of *Georgia* v. *Grand Isle,* but the rule should not be applied to cases of this character. Such a contingency could not have been anticipated by the legislature, and such a construction would contravene the general policy of the general act. Ralph Chamberlin could not be regarded as a citi-zen, or an inhabitant of this state, or of the United States, at the time of the birth of this pauper, nor at any period of his life after his removal to the province of Canada. It is true a temporary ab-sence will not divest one of the character of a citizen of the state to which he belongs ; but when one removes to a foreign country, settles himself there, and engages himself in the trade and business of that country, the *animus manendi* is fully established ; and when that fact exists, he is stamped with the national character of that

country, and his rights as a citizen of this country are at least suspended during that period. The rule seems to follow from adjudged cases in the courts of the United States ; 2 Cranch 120 ; *Case* v. *Clarke*, 5 Mason 70 ; *Cooper* v. *Gilbrath*. 3 Wash. C. C. 546. It cannot be regarded as an unreasonable construction of this act to say, that if the rights of the father of this pauper, as a citizen of this state and country, were lost or suspended by his removal and residence in Canada, his right to transmit a derivative settlement to his children during that period was lost or suspended also.

The pauper, during his life, could be regarded only as an alien; and subject to all the incapacities of one. He was under no natural allegiance to this country, and the correlative duty of protection was not due from this country to him, except such as is due to all aliens during the time they are within its jurisdiction. Justice Blackstone, 1 Bl. Com. 394, observes that " children of aliens, born in England, are, generally speaking, natural born subjects, and are entitled to all the privileges of such." Judge Swift, 2 Swift's Dig. 618, says that "by the common law, the children of private citizens born abroad are aliens." Chancellor Kent has remarked; 2 Kent's Com. 1, that " that is the rule of the common law without any regard or reference to the political condition or allegiance of their parents, with the exception of embassadors." In the case of *Lynch* v. *Clark*, 1 Sandf. Ch. R. 584, 639, it was held that a person born in New York of alien parents, during their temporary sojourn there, and who returned while an infant with her parents to their native country, and always resided there afterwards, was a citizen of the United States by birth. The doctrine of that case Chancellor Kent observes, " is that of the English common law, and was the law of the colonies, and became the law of each and all the states when the declaration of independance was made, and continued so until the establishment of the constitution of the United States, when the whole exclusive jurisdiction of the subject of citizenship passed to the United States, and the same principle has there remained." If the infant in that case was a citizen of this country by birth on a mere temporary sojourn of her parents here, surely the pauper, in this case, must be regarded as an alien, and a subject of the province of Canada, without reference to the citizenship of his father.

The question as to the citizenship of this pauper is unaffected by the act of congress, passed April 14, 1802, which provided that " the children of persons who now are, or have been citizens of the United States shall, though born out of the limits and jurisdiction of the same, be considered as citizens thereof." That act is retrospective in its character, and has no effect on children born subsequent to its passage. 2 Kent's Com. 14. 2 Swift's Dig. 818. Neither is it affected by the act of congress of February 18, 1855, as that act was passed after the decease of the pauper, which occurred during the winter of 1853–4, as well as after the decease of the pauper's father ; and the act itself applies only to those persons whose parents were citizens of the United States at the time of their birth. The pauper was therefore an alien at the time of his birth, and remained so to the time of his decease, and was as incapable of having a derivative settlement in this state from his father, as he was incapable of obtaining a settlement by residence. If this pauper derived a settlement in that manner in Danville, then, upon the same principle, his children, if he left any, would derive a similar settlement, though he had lived and his children were born in Canada, and that right of derivative settlement in Danville would be transmitted from generation to generation among those who are aliens, and who are under a natural allegiance to other governments. There is no place where such a consequence can be arrested when that construction of the act is applied to a case of this character. Such consequences could never have been intended by the legislature in making provision for the poor of this state, and such construction is deemed unwarranted by the letter or spirit of the act. I think, therefore, the pauper was unduly removed, and, upon the facts in the case as agreed upon by the parties, the judgment of the county court should be reversed, and judgment rendered for the defendant.

BENNETT, J. It is hardly necessary that I should add anything in this case; but it appears to me to extend the statute which enacts that " legitimate children shall follow and have the settlement of their father until they gain a settlement of their own," to a case like the present, would be to extend it to all possible cases indefi-

nitely, and if this pauper took a derivative settlement in Danville from his father, I see not why the alien born children of this pauper might not claim through him a settlement in Danville also.

It appears to me that it is going far enough to hold that a child born in another sister state of a father having at the time his domicil in such state, shall take the settlement of his father in this state, if he have one. This may arise from the community of privileges between citizens of the several states, but if the father had been a foreigner, the place of birth of the child would have been its place of settlement.

In the case now before us the pauper was born an alien to all intents and purposes. He could claim no personal rights or privileges at the hands of the state or the general government, and he owed to neither government any duties growing out of an allegiance. The father removed from this state about the year 1824, and lived in Canada up to the time of his death in 1844, having in that government a fixed residence, and without any intention of returning to the States, and during that time the pauper in question was born. I do not apprehend it is necessary to decide what the effect of this removal of the father from this state to Canada, under the facts which attend this case, would have upon his own settlement. It might if it was necessary, to say the least, be claimed with great plausibility that a citizen might in good faith adjure his country, and that the assent of his government would be presumed, if there was no statute regulation upon the subject, and that he should be deemed thereby to be denationalized.

Our naturalization laws all seem to be founded upon that basis, and it might well be inquired whether this is not to be treated, at the present day, as the practical and fundamental American doctrine on this subject. I should apprehend that if the father was to be treated as denationalized, it would follow that there was on his part a perpetual abandonment of his previous settlement in the town of Danville, and of all his rights and privileges as an American citizen, and that it could not be maintained that upon his subsequent return to this state, his settlement in Danville would be revived. But we are not called upon to consider what would have been the effect, if any, of the father's return to this state,

upon his own settlement, or upon that of the pauper. It is a common principle that a foreign parent cannot communicate a settlement to a child, and I am, at all events, satisfied to treat the father in this case as *quasi* a foreign parent, and that he did not and could not communicate a settlement in this state to this child born an alien.

This, as it seems to me, accords with a sound construction of the statute. When the statute says the child shall have the settlement of the father until he gains a settlement of his own, it would seem to me not to be the intention to include alien born children, who could not gain a settlement by a residence in a town, and I have some doubt whether aliens should be considered as included in the general terms " every person," and " any person," in those sections of the statute which provides for the gaining of a settlement by other means.

Although the views of all the members of the court are not the same in relation to this case, yet I think the defendant town is entitled to a judgment, that the pauper was unduly removed.