STATE OF VERMONT, EX REL. CHARLES A. PHELPS *v.* S. HOL-
LISTER JACKSON.

January Term, 1906.

Present: ROWELL, C. J., TYLER, MUNSON, WATSON, HASELTON, POWERS,
and MILES, JJ.

Opinion filed January 24, 1907.

*Quo Warranto to Oust From Office of State's Attorney—
Residence and Domicile—Citizenship—Evidence—Hear-
say— Declarations— Presumptions — American Citizen
Born in Canada—Requisite Choice at Majority—Act of
Congress of 1855—Construction.*

Where it appears only that a person is a resident of this State, he will be presumed to be also a citizen thereof.

But where it appears that a resident of this State was born in a foreign country, it will be presumed that he is still a citizen of that country, notwithstanding his residence here.

The declarations of a deceased person who was born an American citizen, made while he was residing abroad, evincing an intention to adhere to the allegiance of his birth, are admissible upon the question of his then citizenship.

When a fact that in its nature is continuous, such as allegiance, citizenship, or residence in a certain place, is proved to have existed, the general rule is that it is presumed to continue till the contrary is shown.

Citizenship and domicile are not identical, nor does either necessarily control the other; and a mere change of domicile does not effect a change of allegiance.

To overcome the presumption of the continuance of an allegiance proved to have existed at a certain time, evidence must be adduced of an actual removal or continued residence abroad, with a fixed purpose to terminate the former allegiance.

A party cannot be heard to complain because hearsay evidence that he put into the case is used against him; and both that evidence and such hearsay as was received without objection, is properly weighed and considered by the trier.

A person born in Massachusetts in 1771, by continuing to reside there till 1807 and giving his allegiance to the United States after the Declaration of Independence, became an American citizen; and his mere subsequent removal to Canada in no way affected that status.

On *quo warranto* to oust the respondent from the office of State's Attorney, on the alleged ground that he is a British subject, it appeared that the respondent's great-grandfather was born in Petersham, Mass., and continued to reside there as late as December, 1807, and that the earliest date shown of his subsequent removal to Canada was in 1812. *Held*, that he will be presumed to have still resided in said Petersham in March, 1810, when the respondent's grandfather was born, and that there is no evidence in the case sufficient to overcome that presumption.

Since the grandfather was born an American citizen, neither his removal to Canada during his minority, nor any act of his father,

could affect that status, which would abide with him till he himself, after attaining his majority, by his own voluntary act did something to legally divest himself of it.

The respondent's grandfather while a minor, removed from the United States, where he was born an American citizen in 1810, to Canada, where he resided during the rest of his life. He was married there in 1833, and a son, the respondent's father, was born to him there in 1838. *Held,* that the respondent's father did not come within the terms of the Act of Congress of 1802, providing that "The children of persons who *now are* or *have been* citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States," etc.

On *quo warranto* to oust the respondent from the office of State's Attorney on the alleged ground that he is a British subject, wherein it appeared that his grandfather while a minor, removed from the United States, where he was born an American citizen in 1810, to Canada, where he resided during the rest of his life; that he became of age in 1831, was married in Canada in 1833, and a son, the respondent's father, was born to him there in 1838; evidence considered, and *held,* that there is no evidence in the case inconsistent with the presumed continuance of the grandfather's original citizenship from the date of his majority to the birth of the respondent's father, who was, therefore, made an American citizen by the Act of Congress of 1855, which provides that, "All children heretofore born or hereafter born out of the limits of the jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the right of citizenship shall not descend to children whose fathers never resided in the United States."

*Lyndon* v. *Danville,* 28 Vt. 809, and *Albany* v. *Derby,* 30 Vt. 718, distinguished and explained.

A person who lived in the United States only as a minor and as a member of his father's family, "resided" there within the meaning of the proviso of the Act of Congress of 1855, that "the right of citizenship shall not extend to children whose fathers never *resided* in the United States."

The citizenship thus acquired by the respondent's father by virtue of the Act of Congress of 1855, required an election on his part

upon attaining his majority, or within a reasonable time thereafter, whether he would preserve that status, or become a Canadian citizen; which election when once made would be binding upon him and the country of his choice.

Evidence examined, and *held* that the respondent's father, by coming to the United States when a minor and completing his education here, by residing here several years after attaining his majority, by taking the freeman's oath and paying taxes here, and by other acts, elected to preserve his status as an American citizen, and that, therefore, the respondent, who was born in Canada in 1875, was, by virtue of the Act of Congress of 1855, also born into that kind of American citizenship which required him to elect, upon attaining his majority, whether he would preserve that status, or become a Canadian citizen; and that he did this and chose American citizenship by coming to Vermont while a minor permanently to reside, and by, upon reaching his majority, completing his election by taking the oath required by law and securing his enrollment as a voter in Barre, and by exercising and enjoying all the rights and duties of citizenship from that time till his election as State's Attorney, which office he was, therefore, legally qualified to hold.

Quo Warranto brought, under V. S. Chap. 82, to the Supreme Court for Washington County at its October Term, 1905, and heard at the January Term, 1906, upon evidence taken and filed. The complaint alleged that the respondent, as State's Attorney of Washington County, to which office he had been duly elected, had filed with the clerk of Washington County Court an information charging the relator with keeping a bucket shop, upon which information the relator had been arrested and forced to give bail, and that the case was still pending in court; that the respondent is in fact a British subject, born in Canada, and therefore unlawfully exercising the duties of said office. The opinion fully states the case.

*May & Hill,* and *R. A. Hoar* for the relator.

The relator can only raise the question of the respondent's citizenship by quo warranto. *McGregor* v. *Balch,* 14 Vt. 428; *Fancher* v. *Stevens,* 61 Vt. 616; 23 Am. & Eng. Enc. Law 630; 23 Wend. 490; 122 Mass. 145; 133 N. Y. 569; High's Ex. Remedies, §624; Spelling Ex. Remedies §1788; *State* v. *McGeary,* 69 Vt. 461; *Boyd* v. *Nebraska,* 143 U. S. 178; *State* v. *Vail,* 53 Mo. 97; *State* v. *Lane,* 16 R. I. 620; *State* v. *Horne,* 42 N. J. L. 435; *Chandler* v. *Walker,* 68 Ga. 681; *State* v. *Martin,* 46 Conn. 497; *People* v. *London,* 13 Colo. 303.

At common law, an alien has no political rights. *Walther* v. *Rabott,* 30 Cal. 185; 2 Am. & Eng. Enc. Law (2d ed.) 68; Throop Public Officer, § 72; *State* v. *Smith,* 14 Wis. 497.

Horatio Nelson Jackson, the respondent's grandfather, never resided in the United States, within the meaning of the Act of Congress of 1855, since he never lived there except while a minor and as a member of his father's family. *Lyndon* v. *Danville,* 28 Vt. 809; *Albany* v. *Derby,* 30 Vt. 718; *Murray* v. *Betsey,* 2 Cranch 119; *Juando* v. *Taylor,* 2 Paine 652; Webster's Citizenship, p. 71, 76; *Mansfield* v. *Tunbridge,* 62 Vt. 455; *People* v. *Platt,* 117 N. Y. 159.

*John W. Gordon, W. A. Lord,* and *S. Hollister Jackson* for the respondent.

Children born in a foreign country of American parents who resided there, but never renounced their American citizenship, are citizens of the United States. *Ware* v. *Wisner,* 50 Fed. 310; Van Dyne, Citizenship, p. 34; *State* v. *Adams,* 45 Iowa 99; *Calais* v. *Marshfield,* 30 Me. 511; *Peck* v. *Young,* 26 Wend. 613; *Inglis* v. *Trustees Sailors' Snug Harbor,* 3 Pet. 99; *Ludlam* v. *Ludlam,* 26 N. Y. 356; 2 Kent's Com. 49, note a; Hallock on International Law, ch. 29, §3.

A citizen cannot renounce his allegiance to the United States without its permission, declared by law; and if there is no existing ·regulation in the case, the rule of the English Common Law is applicable. *Comitas* v. *Parkerson,* 56 Fed. 559; Blackstone Com. 370; 1 East Pleas of the Crown 81; *Shanks* v. *Dupont,* 3 Pet. 243.

A father cannot by any act of his deprive his son of the status of American citizenship. Van Dyne, Citizenship, 43, 48.

POWERS, J.     This is a petition for a writ of *quo warranto* to test the right of the respondent to hold the office of state's attorney of Washington County. As the case is presented, the only question for our determination is, was Mr. Jackson a citizen of the United States at the time of his election to the office in 1904?

It is said that we were not in harmony with the authorities when we held in *State ex rel.* v. *Danforth,* 28 Vt. 594, that in these proceedings persons in possession of an office are presumed to be regularly elected and entitled to hold until the contrary appears; and that the true rule is that in such cases the burden is on the respondent to show legal title to the office. *State* v. *Harris,* (Ark.) 36 Am. Dec. 460; 3 Elliott Ev. § 1930; 2 Spelling Ex. Rem. §1878; *State ex rel.* v. *Powers,* 136 Mo. 376, Bailey Onus Prob. 438. However this may be, we regard it of no importance in this case, as the citizenship of the respondent is presumed. This presumption arises from the mere fact of his residence here. *Devanney* v. *Hanson,* (W. Va.) 53, S. E. 603; *State* v. *Blackmo,* 6 Blackf. (Ind.) 488; *Buckley* v. *McDonald,* (Mont.) 84 Pac. 1114; 7 Cyc. 147. It was this rule which Judge Redfield had in mind when he said in *Blood* v. *Crandall,* 28 Vt.

at p. 400, that "the general presumption is in favor of citizenship."

This presumption, however, avails the respondent in this case nothing, for it is immediately met with proof of his foreign birth; from which fact arises a presumption that he is a citizen of the country of his birth and not of his residence,— which requires him to show that his citizenship is not controlled by that fact.   *Quimby* v. *Duncan,* 4 Har. (Del.) 383; *Minneapolis* v. *Renn,* 56 Fed. Rep. 576; 7 Cyc. 147.

These presumptions must be carried along and weighed and considered in determining the facts upon which our decision is based.

The Rev. John Jackson, the great-grandfather of the respondent, was born at Petersham, Mass., July 2, 1771, and continued to reside in that State until some time after December 21, 1807,—the date of the birth of his daughter, Sarah Saphronia.   His citizenship is questioned by the relator's counsel, but not seriously, we think, for, though born a British subject, his continued residence in this country after the Declaration of Independence, giving allegiance to the new government, establishes his American citizenship.   No doubt he had the right to elect whether he would retain his native allegiance to the British crown, or become a citizen of this country.   But nothing appears to indicate that he elected to adhere to the Crown, so he is to be deemed to be an American citizen.   *Inglis* v. *Sailors' Snug Harbor,* 3 Pet. 99; *Young* v. *Peck,* 21 Wend. 389; *Moore* v. *Wilson,* 18 Tenn. 406; *Calais* v. *Marshfield,* 30 Me. 511.   On this point there is no conflict between the English and American authorities, except that we date the separation of the two countries (the date to which this right of election has reference) from July 4, 1776, while in England it is not considered to have taken

place until the treaty of peace in 1783.   *Inglis* v. *Sailor's Snug Harbor, supra; Doe* v. *Acklam,* 2 B. & C. 779.   Nor did John Jackson's mere subsequent removal to Canada affect the citizenship so established.   *Ainslee* v. *Martin,* 9 Mass. 454; *Campbell* v. *Wallace,* (N. H.) 37 Am. Dec. 219; *Quimby* v. *Duncan, supra; Minneapolis* v. *Renn, supra; State* v. *Adams,* (Ia.) 24 Am. Rep. 760; *Hauenstein* v. *Lymham,* 100 U. S. 483.

While John Jackson was residing at Petersham, his son, Horatio Nelson Jackson, was born there March 5, 1810.   The date of this birth is conceded, but it is insisted on behalf of the relator that there is no legitimate evidence before us that Horatio Nelson was born at Petersham, and that the circumstances, historical and otherwise, show that he must have been born in Canada after his father, John Jackson, moved there; and that the only evidence of the place of birth rests in a family tradition, which is merely hearsay and inadmissible to prove the fact.   It appears by the record that a part of the evidence now objected to as hearsay was put into the case by the relator himself, and as to such he cannot now be heard to complain. *Davis* v. *Streeter,* 75 Vt. 214, 54 Atl. 185.   Some further part of the same came in without objection, and is properly before us.   So without deciding the question of its admissibility, we reject the tradition, except so far as it came into the case as aforesaid.   Indeed, if we were to reject all of which the relator now complains, our finding would be the same.   For it is conceded that John Jackson was residing in Petersham as late as December, 1807, and the presumption is that he continued to reside there until the contrary appears.   It was said by Judge Peck in *Farr's Admr.* v. *Payne,* 40 Vt. 615, that "where a fact is proved which in its nature is continuous, the general rule is that it is presumed to exist till the contrary is

proved." Residence is a fact of this character, and one to which this rule applies. Accordingly in *Rixford* v. *Miller,* 49 Vt. 319, it was held that when the residence of the defendants in that case was once established in the State of New York, it was presumed to continue there until the contrary was shown. These cases were approved and the principle recognized and applied in *Sowles* v. *Carr,* 69 Vt. 414, 38 Atl. 77. Judge Brewer says in *Keith* v. *Steller,* 25 Kan. 100, that it is a familiar rule that residence once established, is presumed to continue until it is shown to have been changed. To the same effect are *Price* v. *Price,* 156 Pa. St. 617, *Kilburn* v. *Bennett,* 3 Metc. 199; *Ripley* v. *Hebron,* 60 Me. 379; *Bank* v. *Bank,* 87 Ia. 479; *Nixon* v. *Palmer,* 10 Barb. 175; *Greenfield* v. *Camden,* 74 Me. 56.

Rejecting the tradition referred to, there is nothing in the case to show John Jackson residing in Canada until several years after the birth of Horatio Nelson. In the cross-examination of Dr. J. Henry Jackson by relator's counsel, it appeared that John Jackson went to Canada in 1812, but this is the earliest date of his removal there shown by the record,—excluding the tradition referred to. Samuel N. Jackson, son of Horatio Nelson, and father of the respondent, while the relator's witness, in response to orator's counsel testified as follows:

Q. "Your father was also born in Canada?" A. "No sir, in the United States, in Massachusetts." The relator seeks to avoid responsibility for this statement on the ground that when the question was asked he supposed that the witness had reliable data or knowledge on which to predicate his answer; whereas in fact it turns out that he had no information save the family tradition. The relator's position is untenable. He would hardly be justified in assuming that the

witness had *personal* knowledge of the birthplace of his father. He must have understood that he would testify from information acquired from some person or some source; and he should have inquired about the sources of his information, if he did not want to take a chance on his answer. Moreover, Dr. J. Henry Jackson, in answer to relator's counsel, testified that he himself found a record of the birth of Horatio Nelson in the town clerk's office in Petersham, when looking up the genealogy of the family some fifteen years ago. Such a record cannot now be found, but considering the early time to which the investigation relates, the laxity which prevailed in such matters at that time, and the present condition of the records referred to as shown by the testimony of the respondent and the preface to the volume of vital statistics of that town, this is not a matter of much surprise.

Our attention is called to many circumstances which the relator claims tend to show that Horatio Nelson must have been born in Canada. One of those vigorously urged upon our consideration is the fact that the first three sons of John Jackson were named after Presidents of the United States; while the fourth was named after a British Admiral, Horatio Nelson, and the fifth after a British poet, Joseph Addison. We attach but little importance to this. John Adams Jackson was born in 1800 while John Adams was President. But James Madison Jackson was born in 1804,— five years before James Madison was President. George Washington Jackson was born in 1805,—eight years after George Washington's term as President had expired, several years after his death and during the second term of Thomas Jefferson.

33

None of the circumstances alluded to, nor all of them together are sufficient to meet the presumption and evidence showing the fact to be as claimed by the respondent. We have no hesitation, therefore, in finding that Horatio Nelson Jackson was born in Massachusetts. And this being so he was born an American citizen, and his removal to Canada during his minority would not divest him of his character as such, nor could his father, John Jackson, do anything after his birth to deprive him of it. Van Dyne Cit. 43 (Hernandez's case). His American citizenship attended him, abided with him and was available to him, until he himself, after attaining his majority, by his own voluntary act, did something to legally divest himself of it. He was not required to elect his allegiance, he was born into it.

In this view of the matter, the subsequent life history of the Rev. John Jackson is of no further interest to us in this discussion, and he passes out of the case.

Horatio Nelson Jackson resided in Canada practically all of the time after his removal there until his death. He spent some portions of the later years of his life in the states, but it is not claimed that he established a permanent residence here. He became of age in 1831, married in 1833, and a son was born to him at Brome, P. Q., in 1838. This son is Samuel Nelson Jackson, father of the respondent. The time, then, which elapsed between the date when Horatio Nelson attained his majority and the birth of Samuel Nelson was about seven years. It is to this interval of time that we now direct our attention, for during his minority Horatio Nelson was not competent to expatriate himself,—*Ludlam* v. *Ludlam,* 26 N. Y. 356—and the status of the son Samuel became fixed at the date of his birth. The point of our enquiry will be to ascertain whether Horatio Nelson retained the citizenship of his

birth until the birth of the son, Samuel Nelson; for if he did, Samuel Nelson was an American citizen at birth. But if Horatio Nelson did anything which amounted to expatriating himself after he became of age and before the birth of the son, it would prevent the son from acquiring American citizenship from the father.

When Horatio Nelson became of age, the act of Congress of 1802, (2 Stat. at L. 155) was in force. This act provided that "the children of persons who *now are* or *have been* citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States. Provided that the right of citizenship shall not descend to persons whose fathers have never resided within the United States."

The respondent claims that Samuel Nelson's status as a citizen of the United States is fixed by this act which remained in force until 1855. But this act did not include Samuel Nelson. It only applied to persons whose parents were citizens in 1802, or had been previous to that time. Samuel Nelson's father was not born until 1810, and so did not come within its terms. Yet this law remained on the statute books with its limitations and defects apparently undiscovered until Mr. Horace Binney published in the American Law Register, Vol. 2, p. 193, a vigorous article on the subject which induced the passage of the Act of 1855, (Comp. St. 1901, 1268) which reads as follows: "All children heretofore born or hereafter born out of the limits and jurisdiction of the United States whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the right of citizenship shall not descend to children whose fathers never resided in the United States."

This act took effect during the minority of Samuel Nelson and applies to him if the proof brings him within its terms.

So it is that the first question to determine is, was Horatio Nelson a citizen in 1838 when Samuel Nelson was born?

Citizenship and domicile are not the same thing. Neither necessarily controls the other. The matter of domicile is ordinarily of private concern only. Citizenship is a matter of public concern,—a matter over which the government assumes, in some degree, control. It is in its nature continuous, and once established, it is presumed to continue until the contrary is shown. *Minneapolis* v. *Renn, supra.* A change of domicile merely does not, as we have seen, effect a change of allegiance. To overcome the presumption of the continuance of the allegiance once established evidence of an actual removal or a continued residence abroad with a fixed purpose to throw off and terminate the former allegiance must be produced. Thus in *Quimby* v. *Duncan,* 4 Har. (Del.) 385, a case involving the question whether one Hyatt was a citizen of that state, he having left the state at a certain time since when he had not been heard of, it is said that "a man is to be regarded as a citizen of his native state until it can be shown that he has changed this relation by leaving *animo manendi* or by acquiring a citizenship elsewhere. And this is to be not merely by a change of habitancy or residence, but by a change of citizenship." In *Beavers* v. *Smith,* 11 Ala. 20, a case involving the citizenship of the widow of one who had removed to the Republic of Texas, it is said "* * * it is very certain that the mere removal of a citizen of the United States to a foreign country does not work a forfeiture of his political privileges as a citizen of the United States. He may by the removal owe a local, temporary allegiance to the sov-

ereign of his domicile, but neither in England nor the United States would a sojourn of any length of time, entitle such a resident to the political rights of a natural born subject or citizen. * * * Her residence there is entirely consistent with the retention of her political rights derived from her birth in South Carolina, and until some further act is shown, inconsistent with the future assertion of this right, it appears to us illogical and unwarrantable to deduce such an inference from an act so equivocal as residence merely."

*Hauenstein* v. *Lynham,* 100 U. S. 483, involved the right of the heirs of Hauenstein, who died in Richmond, Va., leaving estate there, to inherit his property which was under an inquisition of escheat. The Court said: "The plaintiffs in error are all citizens of Switzerland. The deceased was also a citizen of that country, and removed thence to Virginia where he lived and acquired the property to which the controversy relates and where he died. The validity of his title is not questioned. There is no proof that he denationalized himself or ceased to be a citizen and subject of Switzerland. His original citizenship is therefore, to be presumed to have continued.' Best on Presumptions, 186. According to the record his domicile, not his citizenship, was changed." *State* v. *Adams,* 45 Ia. 99, 24 Am. Rep. 760, was an action to test the right of the defendant to hold the office of mayor of Aroca. The defendant's grandfather was born in Connecticut, removed to Canada in 1790, with intention of making his permanent domicile there, and remained until his death. The defendant's father was born in Canada and served in the army under compulsion. The defendant was born in Canada and moved to Iowa. It was held that the defendant was a citizen of the United States and in the absence of evidence it would not be

presumed that the grandfather intended to renounce his citizenship.

In *Ware* v. *Wisner,* 50 Fed. 310, it was held that a son born in Canada of American parents who resided there, but who had never renounced their citizenship, was a citizen of the United States, though both father and son had engaged in business there and several times voted upon their property qualifications, as provided by law.

There is no evidence in this case inconsistent with a continuance of Horatio Nelson's original citizenship during his residence in Canada from the time he came of age to the birth of Samuel Nelson. We are told that he voted in Canada, but whether he did so before 1838 is left to conjecture. It is shown that he held title to real estate there just before the birth of Samuel Nelson. The deed itself is a quit claim of 72 acres with buildings and improvements, but the character of the property and whether he resided upon it or what he did with it, does not satisfactorily appear. He was appointed a justice of the peace, but not until after the date in question,— 1838.

On the contrary, the evidence of the respondent discloses that by his statements,—and these were admissible, *Baptiste* v. *De Volunbun,* 5 Har. & J. (Md.) 86—he always claimed to be an American citizen and many circumstances are shown to indicate his intention to adhere to the allegiance of his birth, —and so we find the fact to be that he did adhere to it. These views are not in conflict with *Lyndon* v. *Danville,* 28 Vt. 809 and *Albany* v. *Derby,* 30 Vt. 718. They are both pauper cases which involved the question of derivative settlements. In the former, Ralph Chamberlin, the father of the pauper was born in Danville in 1800. In 1824 he moved into Canada, where

the pauper, Israel, was born in 1826.   The decision of the case was by a divided Court, all three of the judges filing opinions.   Chief Judge Redfield asserted that the pauper was himself a citizen by the Act of Congress of 1802, having been born of parents who were citizens before the passage of that act.   Judge Isham held that the Act of 1802 did not affect the citizenship of the pauper as it was retrospective in its effect and did not include children subsequently born, and that the Act of 1855 had no effect upon the case bcause it was passed after the death of both father and son.   Judge Bennett was satisfied to consider the pauper the son of a *quasi* foreign parent. *Albany v. Derby,* on this point, simply follows the other case.

It is of interest to note that Judge Poland presided at the trials of both these cases in the court below, and that his reversal in the first, of which he must have known, did not create such an impression upon his mind as to deter him (three years later) from ruling the second in precisely the same way.

But we have no occasion to criticise these cases, for that which completely distinguishes them from the case in hand is the application of the aforesaid Act of 1855,—which, it was held, was passed too late to apply to those cases, but which certainly applies to this one.

But we are reminded that the act expressly provides that the rights of citizenship shall not descend to children whose fathers never resided in the United States, and it is urged that Horatio Nelson Jackson never resided here in the sense in which the term is used in the act.   Our attention is called to our own decisions in pauper cases wherein we discuss the inability of a minor to acquire a residence or settlement.   But those cases are not in point.   There is nothing in the act indicating that any intent on the part of the person in question is required.   The purpose of the provision is to prevent the

residence abroad of successive generations of persons claiming the privileges of American citizenship while evading its duties,—which does not require the narrow construction asked for by the relator.

The citizenship acquired by Samuel Nelson Jackson at birth was a qualified one and of that peculiar character under the law which required an election on his part upon attaining his majority or within a reasonable time thereafter whether he would conserve the citizenship of the United States or that of Canada. This election when once made is binding upon him and the country of his choice. *Ludlam* v. *Ludlam*, 26 N. Y. at p. 371; Van Dyne on Cit. 38. Such an election Samuel Nelson seasonably made, for he came to this country a minor, completed his education here, resided here several years after attaining his majority, took the freeman's oath, engaged in business, paid taxes, and intended to become and thereby did become an American citizen in the full and unqualified sense of the term. Being desirous of engaging in the ministry, he applied in Massachusetts for certain Congregational funds to assist him in completing his training, but his application not being granted to the extent desired, he made a more advantageous arrangement for funds in Canada under an agreement that he would serve in the ministry there for a period of five years. His subsequent residence in Canada was as an American citizen. He did not, and would not had he been required, take the oath of allegiance there; he did not intend to do, and did not in fact do anything to divest himself of his full rights as a citizen of the United States.

His son, S. Hollister, the respondent, was born in Canada in 1875; born into that same kind of American citizenship which required an election on his part as it had of his father. He came to Vermont permanently to reside in 1895, a minor

and upon arriving at full age, made complete election of American citizenship by taking the oaths required by law, securing his enrollment as a voter in Barre, and by exercising and enjoying all the rights and performing all the duties of citizenship from that time until his election as state's attorney of Washington County,— an office which he was, by law duly qualified to accept and fill.

*Petition dismissed with costs against the relator Phelps.*