[Sac. No. 5910.  In Bank.  Apr. 23, 1948.]

TOM COUMAS, Petitioner, v. THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent; THE PEOPLE, Intervener.

Anthony J. Chargin, Public Defender, and Stanley P. Mamalakis for Petitioner.

Frederick L. Feldon, County Counsel, for Respondent.

Fred N. Howser, Attorney General, Clarence A. Linn, Deputy Attorney General, Chester E. Watson, District Attorney, and Bradford Crittenden, Deputy District Attorney, for Intervener.

SPENCE, J.—Petitioner seeks a writ of prohibition to restrain the respondent court from proceeding with his scheduled trial under an amended indictment returned on March 14, 1934, and charging him in two counts with connected offenses perpetrated on April 20, 1932, in the city of Manteca, county of San Joaquin: (1) "murder [of] one Olive Taylor"; and (2) "assault upon the person of William Duval with a deadly weapon, with the intent . . . to commit murder." He was arrested in Manteca on September 26, 1947, and imprisoned in the county jail awaiting trial. Upon arraignment, he pleaded the defenses of "prior conviction" and "former jeopardy" by reason of a judgment entered after criminal prosecution of the same charges in the Felony Court of Corinth, Greece.

684

■ Section 793 of the Penal Code provides as follows: "When an act charged as a public offense is within the jurisdiction of another state or country, as well as of this state, a conviction or acquittal thereof in the former is a bar to the prosecution or indictment therefor in this state." Petitioner's pleas come precisely within the contemplated scope of this penal statute, and "prohibition is an appropriate remedy to prevent [his] retrial" on the offenses in question. (*Rodriguez* v. *Superior Court*, 27 Cal.2d 500, 501 [165 P.2d 1]; see, also, *Jackson* v. *Superior Court*, 10 Cal.2d 350, 352 [74 P.2d 243, 113 A.L.R. 1422], and cases there cited.)

■ There is no dispute as to the facts. Petitioner, a native of Greece, emigrated on January 4, 1907, to the United States. He was then 17 years of age. On February 25, 1914, he became a naturalized citizen of this country, at which time he took the required oath in renouncement of "allegiance . . . to any . . . state or sovereignty of . . . which [he] was before a subject or citizen" and in pledge of "true faith and allegiance" to the United States. (54 Stats. 1157, 8 U.S.C.A., § 735; formerly 34 Stats. 596, as amended, 8 U.S.C.A., § 381; 2 Am.Jur., § 232, p. 583.) The Greek government never at any time consented to his foreign naturalization.

Petitioner resided in this country continuously from his entry until shortly after April 20, 1932, the date on which he allegedly committed the two above-mentioned crimes of "murder" and "assault . . . with a deadly weapon" in the city of Manteca. To avoid arrest petitioner immediately fled from this state and ultimately reached Greece. On May 12, 1932, he was indicted for the two criminal offenses by the grand jury of San Joaquin County. An amended indictment was filed on March 14, 1934, and thereupon the United States government instituted proceedings with the Greek government for the extradition of petitioner as a fugitive from justice. Petitioner successfully resisted these proceedings upon the decision of the Council of the Court of Appeals at Nauplia, Greece, on August 26, 1934, that "he [had] never divested himself of [his] Greek citizenship," and that Greek law therefore absolutely forbade his extradition but required his prosecution and punishment in Greece in accordance with its criminal law. Thereafter petitioner stood trial in the Felony Court of Corinth, Greece, on precisely the same two alleged criminal acts and on October 16, 1935, judgment was entered against him pursuant to a jury verdict (1) finding

him "guilty of manslaughter" on the alleged murder charge and (2) acquitting him on the assault charge but finding him "guilty of the unlawful carrying of a firearm." He was sentenced to serve consecutive terms of imprisonment for the respective crimes as so determined: (1) four years and (2) four months. He served those terms, with credit for 13 months' preliminary imprisonment. Subsequently petitioner returned to the United States, and since his arrest on September 26, 1947, in the city of Manteca, he has been confined in the county jail of San Joaquin County awaiting trial on the criminal charges contained in the amended indictment of March 14, 1934, as above mentioned.

Section 3 of the Greek Code of Penal Procedure provided, at all times here pertinent, as follows: "Hellenes are never extradited to Foreign Authorities not even for the acts committed by them abroad. They are subjected to trial, however, in this country, even for the felonies and misdemeanors committed by them abroad and they are punished in accordance with the laws of this country as if they had committed these acts within the boundary lines of the state, subject, however, to the provisions of existing Government treaties." By article VIII of the Treaty of Extradition as then in force between the governments of Greece and the United States, it was provided: "Under the stipulations of this Treaty, neither of the High Contracting Parties shall be bound to deliver up its own citizens, except in cases where such citizenship has been obtained after the perpetration of the crime for which extradition is sought. The State appealed to shall decide whether the person claimed is its own citizen." (47 Stats. 2185, 2191.) Accordingly, petitioner properly maintains that Greece had jurisdiction over his person because it had never consented to his expatriation, and over the offenses because of its penal law.

While the United States has long supported the doctrine of expatriation in the fullest sense—as involving a "natural and inherent right" of a person to depart from his country of origin and absolve himself from his original allegiance, upon identifying himself with another political community, through naturalization (8 U.S.C.A., § 800; Rev. Stats., § 1999, from act July 27, 1868, ch. 249, § 1, 15 Stats. 223; formerly 8 U.S.C.A., § 15; 2 Am.Jur., § 181, p. 558)— such principle of election as a matter primarily for the individual's determination is contrary to the common-law con-

cept of "perpetual allegiance" to one's native land, which still prevails in many countries today, particularly on the continent of Europe, and precludes the voluntary severance of national ties unless the consent of the government is obtained. (Wilson on International Law, § 50, p. 217.) So it is with Greece as its pertinent law is recited in the "true copy" of the extradition proceedings had against petitioner— "according to which naturalization in a foreign country is not itself sufficient for the loss of Greek citizenship, but there is also required on the one hand the permission of the Greek Government, obtained through the Ministry for Foreign Affairs, and, on the other, the performance of the military duty of the person concerned, nonperformance of which excludes anyone from the right to obtain the aforesaid permission of the Greek Government." Admittedly, petitioner never obtained the consent of the Greek government for his foreign naturalization—in fact, he never made such request— though compliance with such formality was necessary to bring about his loss of Greek citizenship. ■ The taking of the oath of allegiance to the United States and the accompanying renunciation of national ties to any foreign state upon petitioner's naturalization in this country would not automatically divest him of his Greek citizenship, for the matter of denationalization is one for domestic regulation by the government concerned under its particular laws of expatriation. (Wilson on International Law, *supra*, § 50, p. 217; 2 Am. Jur., § 182, p. 559.) The so-called American doctrine of "voluntary expatriation" as a matter of absolute right cannot postulate loss of original nationality on naturalization in this country as a principle of international law, for that would be tantamount to interference with the exclusive jurisdiction of a nation within its own domain. (48 C.J.S., § 9, p. 14.) The qualification of the right of expatriation prescribed by the Greek law, conditioned upon the national's fulfillment of his military obligations in the country of his origin and his procurement of the consent of the government, does not involve abandonment of the fundamental principle but simply accords with recognized distinctions in the nationality concept as followed in different countries.

■ The matter of extradition is a proper subject for treaty negotiation between sovereign nations, and any point of controversy with regard thereto will be governed by the prevailing stipulations of the contracting powers. (35 C.J.S., § 24, pp. 351-352; 52 Am.Jur., § 8, pp. 809-810.) ■ In the

present case, the Treaty of Extradition with Greece expressly provided that "the State appealed to shall decide whether the person claimed is its own citizen," an explicit stipulation according full recognition to any variance in the laws of expatriation existing between the two signatory powers and indicating their mutual intent that the citizenship status of the person seeking refuge in either's territorial limits should be determined in a manner consistent with its standards. Such stipulation in the treaty, signed May 6, 1931, effectively countervails any argument that the United States nevertheless intended that its long prior established position on the "absolute right of expatriation" should prevail in an extradition demand upon the Greek government and would permit disregard of the latter's law under which its national, irrespective of his American naturalization, might still be deemed its citizen. So here, according to Greek law, petitioner on April 20, 1932, the date of his alleged commission of the crimes in Manteca, was still a citizen of Greece by reason of his failure to procure the necessary consent to his foreign naturalization and, upon return to its territorial jurisdiction, he was amenable to prosecution under its penal statutes. (22 C.J.S., § 115, pp. 190-191; 48 C.J.S., § 11, p. 16; see, also, *United States* v. *Bowman,* 260 U.S. 94, 102 [43 S.Ct. 39, 67 L.Ed. 149].) The Greek government so decided and in accordance with its "local laws," petitioner was tried for the offenses committed in this country and sentence was imposed upon the basis of his adjudicated guilt. (Greek Code of Pen. Proc., § 3, *supra.*)

There is no force to the argument that petitioner may not effectively plead the defenses of "prior conviction" and "former jeopardy" before the respondent court because the Greek trial proceedings and judgment were procured by "fraud or collusion." (22 C.J.S., § 245, p. 380; *Edwards* v. *Commonwealth,* 233 Ky. 356 [25 S.W.2d 746, 747]; *Halbert* v. *State,* 18 Okla.Cr. 378 [195 P. 504, 507]; *State* v. *Bartlett,* 181 Iowa 436 [164 N.W. 757, 758].; notes and annots., L.R.A. 1918A, 1181.) Petitioner admits that he "escaped to Greece to avoid punishment," but, as he maintains, he "did not seek his trial by the courts of Greece until the American Government requested his arrest and extradition and the Greek laws were thereafter applied in proper and orderly fashion." At that time it was entirely proper for him to rely on whatever advantage might accrue to him by reason of his claim of Greek citizenship and resist surrender to this country, for

"a treaty of extradition is available to persons having rights secured or recognized thereby, and may be set up as a defense to a criminal prosecution established in disregard thereof." (35 C.J.S., § 25, p. 353; *Dominguez* v. *State*, 90 Tex. Cr. 92 [234 S.W. 79, 83, 18 A.L.R. 503].) There is no evidence in the record indicating any fraud, collusion, trickery or subterfuge on the part of petitioner in procuring, according to Greek law, the determination of his guilt on the criminal charges in question. Rather, it appears that petitioner's trial in the Felony Court of Corinth, Greece, was fair and impartial; that depositions of witnesses before the grand jury of San Joaquin County were duly submitted along with the oral testimony of petitioner for the consideration of the jury in reaching its verdict; and that substantial terms of imprisonment were imposed on petitioner—four years and four months —and served by him, with appropriate credit for preliminary imprisonment, in accord with the judgment entered on the findings of guilt on the alleged crimes as above mentioned. In other words, petitioner's trial in the Greek court was not a mere farce, resulting in a sentence of imprisonment of inconsequential degree as related to the import of the criminal charges against him, but, on the contrary, its "bona fide" character in every respect is clearly shown by the record.

The jurisdiction of the Greek court was established in pursuance of the Treaty of Extradition with Greece as then existing; such treaty, like others, is a part of "the supreme law" of our land and binding upon the courts. (U.S. Const., art. VI, cl. 2; 52 Am.Jur., § 17, p. 815.)

It is ordered that a peremptory writ of prohibition issue as prayed, restraining the respondent court from proceeding further with petitioner's trial.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Respondent's and intervener's petitions for a rehearing were denied May 20, 1948.