**TOSHIO KONDO v. ACHESON,**
Secretary of State.
Civ. 10686.

United States District Court,
S. D. California, C. D.
May 10, 1951.

A. L. Wirin and Fred Okrand, Los Angeles, Cal., for plaintiff.

Ernest A. Tolin, U. S. Atty., Clyde C. Downing, Asst. U. S. Atty., and Robert K. Grean, Asst. U. S. Atty., all of Los Angeles, Cal., for defendant.

BYRNE, District Judge.

This is a proceeding under section 903, Title 8, U.S.C.A. The defendant issued plaintiff a certificate of loss of nationality based on plaintiff's service in the Japanese army. Section 801(c), Title 8, U.S.C.A.[1]

■ The plaintiff admits he served in the Japanese army from April 1945 until the end of the war, but contends that his action did not result in his expatriation because there were extenuating circumstances which made his acts involuntary and removed them from the operation of the statute.

In Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 161 F.2d 860, the court made a thorough examination of the legislative history of section 801(c) and concluded that the section applies only to voluntary acts. This view has been adopted in all subsequent cases dealing with section 801 irrespective of the sub-section concerned.

The Third Circuit adopted this view in Doreau v. Marshall, 170 F.2d 721, 724, but the court then warns: "On the other hand it is just as certain that the forsaking of American citizenship, *even in a difficult situation, as a matter of expediency,* with attempted excuse of such conduct later when crass material considerations suggest that course, is not duress." (Emphasis added.)

In support of his claim that his action was involuntary, plaintiff relies solely on the circumstances existing in Japan prior to the surrender of that country to the allied powers. He does not offer an iota of evidence to show that he in any way remonstrated against his induction or made any effort to avoid service in the Japanese army. On the contrary, his own testimony indicates complete cooperation with the Japanese authorities.

Plaintiff's counsel in his brief points to the conditions existing in Japan; that it

1. Section 801, Title 8, U.S.C.A. provides: "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * *

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; * * *."

was a totalitarian state ruled by the military authorities; that the people were generally in fear of the authorities and particularly in fear of the military authorities who exercised power over the entire country including the schools where military training was an integral part of the curriculum; that the Japanese boy was subjected to fully organized military training "including squad drill, target practice, bayonet fighting and the use of hand grenades and other implements of warfare"; that the Home Ministry controlled the intimate lives of the Japanese people from the "cradle to the grave"; and "In the course of 20 years, Japanese militarists had constructed effective machinery for controlling the speech, thoughts and movements of the people."

Unquestionably counsel presents, in general, an accurate description of conditions existing in Japan at the time the plaintiff entered the armed services and for some time prior thereto. Such conditions are typical of a totalitarian state. In effect, the plaintiff contends that one entering the armed services of such a government is not responsible for his actions.

To accept plaintiff's contention would be to effectively frustrate the purpose of Congress in enacting section 801. This statute, incidentally, was adopted in 1940 at a time when this nation was in the throes of a "cold war" with Japan.

Could it be said that a man schooled and trained under a government whose teaching inculcated in him a belief that his primary allegiance was to that government, would not be responsible for his acts consistent with that belief?

The criminal tendencies of most criminals can be traced to malignant influences that have warped their characters and destroyed their sense of moral values, but it does not necessarily follow that their criminal acts are involuntary merely because inclination to crime was implanted by evil associates. Although the result of a tainted mind, such acts are, nevertheless, the exercise of a free will. An American citizen indoctrinated from youth in the crucible of a foreign philosophy may well attribute loss of appreciation for the country of his birth to his parents, but recognition must be as to what he is, not what he might have been if properly reared.

■ The plaintiff acquired United States nationality by birth in Los Angeles, California, twenty-five years ago. His parents took him to Japan when he was about two years old and, although his father returned to this country, the plaintiff remained in Japan until his recent arrival for the purpose of this proceeding. He acquired Japanese citizenship by registration in the Japanese Family History. He thereby became a dual citizen. He received his education, including military training, in the elementary and middle schools of Japan. He was inducted into the Japanese army in March 1945. He testified that he did not protest his induction or call the attention of the authorities to the fact that he was an American citizen because he was afraid he would be penalized.

■■ The court is not required to accept this self-serving statement merely because there is no one available to offer contrary evidence as to his state of mind. By its very nature this testimony could not be directly contradicted. However, such evidence is not necessarily conclusive where different conclusions may reasonably be drawn from other facts in evidence. Applicable presumptions[2] and inferences drawn from facts in evidence may create a conflict which it is the duty of the trier of fact to resolve.[3] In passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact may consider their interest in the result of the case, their motives, the manner in which

2.  Title 8, Sec. 802 provides: "A national of the United States * * * shall be presumed to have expatriated himself * * * when he shall remain for six months or longer within any foreign state of which he * * * shall have been a national * * *."

3.  Cohen v. C. I. R., 2 Cir., 148 F.2d 336; Elzig v. Gudwangen, 8 Cir., 91 F.2d 434; Gibson v. So. Pac. Co., 5 Cir., 67 F.2d 758; Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 851, 35 L.Ed. 501.

they testify, and the contradictions appearing in the evidence.

This plaintiff had dual citizenship, but he had had no contact with the United States and was reared in an environment inimical to this country. He received military training in the schools of Japan as preparation for services in the Japanese armed forces. He made no attempt to remove his name from the Japanese Family Register.[4] He made no protest with respect to his induction, nor did he even mention his United States nationality. The fact that he was promoted twice within three months following his induction indicated a spirit of cooperation with the Japanese military authorities. At his own solicitation [5] he took a competitive examination as a candidate for officers training school and of a class of twenty-five he was one of ten who passed.

Plaintiff's contention that his action in "entering or serving in, the armed forces of a foreign state" [6] was involuntary, is not supported by the facts. The history of his background considered with the zeal he displayed in his efforts to accomplish promotion in the Japanese army, indicates he was more interested in being a "loyal son of Japan" than preserving his status as a national of a country he had never seen after his infancy.

The cases of Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 161 F.2d 860, and Podea v. Acheson, 2 Cir., 179 F.2d 306, upon which plaintiff relies, are clearly distinguishable from the instant case. In the first named case, Camara resisted induction. He sought the protection of the American authorities without success. The record shows he did not cooperate with the Portugese authorities, never swore allegiance to Portugal and when his service was completed he stowed away aboard an airplane and came to the United States. In the Podea case, the plaintiff, for many years, vainly sought to obtain a passport from the State Department which was denied him under a mistake of law. At the time of his first application he had already been registered by the Roumanian military authorities, without any action on his part, as available for conscription. He informed the American Consul of the claim of those authorities and his consequent need of a passport to establish his American citizenship and nonliability to conscription. He received a ruling of the State Department that he had lost his American citizenship because of the registration of his father as a Roumanian. *This ruling was erroneous.* His repeated efforts met with the same fate. The court, in holding that he never voluntarily expatriated himself, said that the overt acts "were primarily caused by the erroneous advice of the State Department and were farthest from his real purpose".

Plaintiff cites a number of cases [7] decided by the District Courts in which the

---

4. Plaintiff's Exhibit 12, Deposition of Hidemitsu Matsuki, former Japanese War Ministry official; page 7, line 30: "Q. At the time that the war with the United States started, in regard to the Nisei who were then in Japan, how were they treated under the military laws? A. Nisei who had Japanese citizenship were treated as any other Japanese."
   (Ibid) page 8, line 6: "A. If the Nisei's name was not registered in the Family Register, then he would not be called."

5. (Ibid) page 10, line 3: "Q. Is it voluntary whether or not at the first physical examination the person applies for officer candidate training? A. Before the physical examination is completed, an application form for officer candidate is submitted to the Ministry of War, and this is done *voluntarily.*

"Q. Does the person have to ask for that form in order to submit it, or do they give it to him when he is being physically examined? A. No form is given by the Ministry of War. The application is *initiated on his free will* and forwarded to the Ministry of War." (emphasis added).

6. Sec. 801(c), Title 8, U.S.C.A.

7. Ishikawa v. Acheson, U.S.D.C.D.Hawaii, 85 F.Supp. 1; Shibata v. Acheson, U.S.D.C.S.D.Cal., 86 F.Supp. 1; Kanno v. Acheson,* No. 881, U.S.D.C.Hawaii; Komura v. Acheson,* No. 10449, U.S.D.C.S.D.Cal.; Furukawa v. Acheson,* No. 8913, U.S.D.C.S.D.Cal.; Hosoda v. Acheson,* No. 10095, U.S.D.C.S.D.Cal.; Kato v. Acheson,* No. 10302, U.S.D.C.S.D.Cal.; Ozasa v. Acheson, U.S.D.C.S.D.Cal., 94 F.Supp. 436.

* No opinion for publication.

overt acts spelling expatriation were held to be involuntary and suggests, "There is no reason why the instant case should be differently decided." The questions involved in those cases, as in the instant case, were factual. The facts in each of the several cases are not identical. The trier of fact may not stray beyond the record in front of him in weighing the evidence, and the inferences to be drawn therefrom for the purpose of resolving conflicts.

■■ The burden is on the plaintiff to establish that his acts were not voluntary. He has failed to sustain the burden and judgment must be for the defendant.

The defendant will prepare and submit findings of fact and conclusions of law in conformity with this opinion.