## KAWAKITA *v.* UNITED STATES.

No. 570.   Argued April 2–3, 1952.—Decided June 2, 1952.

718

*Morris Lavine* and *A. L. Wirin* argued the cause for petitioner. With them on the brief was *Fred Okrand*.

*Oscar H. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney* and *Beatrice Rosenberg*.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner, a national both of the United States and of Japan, was indicted for treason, the overt acts relating to his treatment of American prisoners of war. He was

convicted of treason after a jury trial (see 96 F. Supp. 824) and the judgment of conviction was affirmed. 190 F. 2d 506. The case is here on certiorari. 342 U. S. 932.

*First.* The important question that lies at the threshold of the case relates to expatriation. Petitioner was born in this country in 1921 of Japanese parents who were citizens of Japan. He was thus a citizen of the United States by birth (Amendment XIV, § 1) and, by reason of Japanese law, a national of Japan. See *Hirabayashi* v. *United States,* 320 U. S. 81, 97.

In 1939 shortly before petitioner turned 18 years of age he went to Japan with his father to visit his grandfather. He traveled on a United States passport; and to obtain it he took the customary oath of allegiance. In 1940 he registered with an American consul in Japan as an American citizen. Petitioner remained in Japan, his father returning to this country. In March, 1941, he entered Meiji University and took a commercial course and military training. In April, 1941, he renewed his United States passport, once more taking the oath of allegiance to the United States. During this period he was registered as an alien with the Japanese police. When war was declared, petitioner was still a student at Meiji University. He became of age in 1942 and completed his schooling in 1943, at which time it was impossible for him to return to the United States. In 1943 he registered in the Koseki, a family census register.[1] Petitioner did not join the Japanese Army nor serve as a soldier. Rather, he obtained employment as an interpreter with the Oeyama Nickel Industry Co., Ltd., where he worked until Japan's surrender. He was hired to interpret communications between the Japanese and the

---

[1] See Blakemore, Recovery of Japanese Nationality as Cause for Expatriation in American Law, 43 Am. J. Int'l L. 441, 449.

prisoners of war who were assigned to work at the mine and in the factory of this company. The treasonable acts for which he was convicted involved his conduct toward American prisoners of war.

In December, 1945, petitioner went to the United States consul at Yokohama and applied for registration as an American citizen. He stated under oath that he was a United States citizen and had not done various acts amounting to expatriation. He was issued a passport and returned to the United States in 1946. Shortly thereafter he was recognized by a former American prisoner of war, whereupon he was arrested, and indicted, and tried for treason.

Petitioner defended at his trial on the ground that he had renounced or abandoned his United States citizenship and was expatriated. Congress has provided by § 401 of the Nationality Act of 1940, 54 Stat. 1137, 1168, as amended, 8 U. S. C. § 801, that a national of the United States may lose his nationality in certain prescribed ways. It provides in relevant part,

> "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:
> "(a) Obtaining naturalization in a foreign state . . .; or
> "(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or
> "(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; or
> "(d) Accepting, or performing the duties of, any office, post, or employment under the government of a

foreign state or political subdivision thereof for which only nationals of such state are eligible; . . . ."

The court charged that if the jury found that petitioner had lost his American citizenship prior to or during the period specified in the indictment, they must acquit him even if he did commit the overt acts charged in the indictment, since his duty of allegiance would have ceased with the termination of his American citizenship. The court further charged that if the jury should find beyond a reasonable doubt that during the period in question petitioner was an American citizen, he owed the United States the same duty of allegiance as any other citizen. The court also charged that even though the jury found that petitioner was an American citizen during the period in question, they must acquit him if at the time of the overt acts petitioner honestly believed he was no longer a citizen of the United States, for then he could not have committed the overt acts with treasonable intent. The special verdicts of the jury contain, with respect to each overt act as to which petitioner was found guilty, an affirmative answer to an interrogatory that he was at that time "an American citizen owing allegiance to the United States, as charged in the indictment."

Petitioner asks us to hold as a matter of law that he had expatriated himself by his acts and conduct beginning in 1943. He places special emphasis on the entry of his name in the Koseki. Prior to that time he had been registered by the police as an alien. There is evidence that after that time he was considered by Japanese authorities as a Japanese and that he took action which might give rise to the inference that he had elected the Japanese nationality: he took a copy of the Koseki to the police station and had his name removed as an alien; he changed his registration at the University from American to Japanese and his address from California to Japan;

he used the Koseki entry to get a job at the Oeyama camp; he went to China on a Japanese passport (see *United States* v. *Husband,* 6 F. 2d 957, 958); he accepted labor draft papers from the Japanese government; he faced the east each morning and paid his respects to the Emperor.

The difficulty with petitioner's position is that the implications from the acts, which he admittedly performed, are ambiguous. He had a dual nationality, a status long recognized in the law.[2] *Perkins* v. *Elg,* 307 U. S. 325, 344–349. The concept of dual citizenship recognizes that a person may have and exercise rights of nationality in two countries and be subject to the responsibilities of both.

---

[2] For discussions of the subject of dual nationality, see *Talbot* v. *Jansen,* 3 Dall. 133, 164–165, 169; *Inglis* v. *Trustees of the Sailor's Snug Harbour,* 3 Pet. 99, 126, 157, 161; *Shanks* v. *Dupont,* 3 Pet. 242, 247, 249; *Perkins* v. *Elg,* 307 U. S. 325, 329, 339, 344–345; *Hirabayashi* v. *United States,* 320 U. S. 81, 97–98; *Savorgnan* v. *United States,* 338 U. S. 491, 500; *United States* v. *Husband,* 6 F. 2d 957, 958; *Dos Reis ex rel. Camara* v. *Nicolls,* 161 F. 2d 860; *Attorney General* v. *Ricketts,* 165 F. 2d 193; *Uyeno* v. *Acheson,* 96 F. Supp. 510, 514–515; *Tomasicchio* v. *Acheson,* 98 F. Supp. 166; *Kondo* v. *Acheson,* 98 F. Supp. 884, 886–887; *Hamamoto* v. *Acheson,* 98 F. Supp. 904, 905; *Boissonnas* v. *Acheson,* 101 F. Supp. 138, 147, 151–152; *Di Girolamo* v. *Acheson,* 101 F. Supp. 380, 382; *Coumas* v. *Superior Court,* 31 Cal. 2d 682, 192 P. 2d 449; *Doyle* v. *Ries,* 208 Minn. 321, 293 N. W. 614; *Ludlam* v. *Ludlam,* 26 N. Y. 356, 376–377; *Lynch* v. *Clarke,* 1 Sandf. Ch. (N. Y.) 583, 659, 677–679; *State ex rel. Phelps* v. *Jackson,* 79 Vt. 504, 520, 65 A. 657, 661; Borchard, Diplomatic Protection of Citizens Abroad, 575–591; Flournoy, Dual Nationality and Election, 30 Yale L. J. 545, 693; Hackworth, Digest of International Law, Vol. III, pp. 352–377; Hyde, International Law (2d ed.), Vol. 2, pp. 1131–1143; Moore, International Law Digest, Vol. III, pp. 518–551; Nielsen, Some Vexatious Questions Relating to Nationality, 20 Col. L. Rev. 840; Oppenheim, International Law (7th ed., Lauterpacht), Vol. I, pp. 606–610; Orfield, The Legal Effects of Dual Nationality, 17 Geo. Wash. L. Rev. 427; Van Dyne, Citizenship of the United States, 24, 34.

The mere fact that he asserts the rights of one citizenship does not without more mean that he renounces the other. In this setting petitioner's registration in the Koseki might reasonably be taken to mean no more than an assertion of some of the rights which his dual citizenship bestowed on him. The deposition of the Attorney General of Japan states that the entry of a person's name in the Koseki is taken to mean that one has Japanese nationality. But since petitioner already had Japanese nationality, he obviously did not acquire it by the act of registration. The Attorney General of Japan further deposed that all Japanese nationals, whether or not born abroad, are duty bound to Japanese allegiance and that registering in the Koseki is "not necessarily a formal declaration of allegiance but merely a reaffirmation of an allegiance to Japan which already exists." From this it would appear that the registration may have been nothing more than the disclosure of a fact theretofore not made public.

Conceivably it might have greater consequences. In other settings it might be the equivalent of "naturalization" within the meaning of § 401 (a) of the Act or the making of "an affirmation or other formal declaration of allegiance" to Japan within the meaning of § 401 (b). Certainly it was relevant to the issue of expatriation. But we cannot say as a matter of law that it was a renunciation of petitioner's American citizenship. What followed might reasonably be construed to mean no more than recognition of the Japanese citizenship which petitioner had acquired on birth—nationality that was publicly disclosed for the first time in Japan by his registration in the Koseki. Cf. 3 Hackworth, Digest of International Law (1942), p. 373. The changing of his registration at the police station and at the University, so as to conform those records to the public record of his

Japanese nationality, might reasonably mean no more than announcing the fact of his Japanese nationality to the interested authorities.

As we have said, dual citizenship presupposes rights of citizenship in each country. It could not exist if the assertion of rights or the assumption of liabilities of one were deemed inconsistent with the maintenance of the other. For example, when one has a dual citizenship, it is not necessarily inconsistent with his citizenship in one nation to use a passport proclaiming his citizenship in the other. See 3 Hackworth, *supra,* p. 353. Hence the use by petitioner of a Japanese passport on his trip to China, his use of the Koseki entry to obtain work at the Oeyama camp, the bowing to the Emperor, and his acceptance of labor draft papers from the Japanese government might reasonably mean no more than acceptance of some of the incidents of Japanese citizenship made possible by his dual citizenship.

Those acts, to be sure, were colored by various other acts and statements of petitioner. He testified for example that he felt no loyalty to the United States from about March, 1943, to late 1945. There was evidence that he boasted that Japan was winning and would win the war, that he taunted American prisoners of war with General MacArthur's departure from the Philippines, that he expressed his hatred toward things American and toward the prisoners as Americans. That was in 1943 and 1944. This attitude continued into 1945, although in May or June, 1945, shortly before Japan's surrender, he was saying he did not care "which way the war goes because I am going back to the States anyway."

On December 31, 1945, he applied for registration as an American citizen, and in that connection he made an affidavit in which he stated that he had been "temporarily residing" in Japan since August 10, 1939; that he came to

Japan to study Japanese; that he possessed dual nationality from birth but that his name was not entered in the census register until March 8, 1943; and that he had "never been naturalized, taken an oath of allegiance, or voted as a foreign citizen or subject, or in any way held myself out as such."

The United States foreign service officer concluded that petitioner had overcome the presumption of expatriation. He reported, "In 1943 his possession of Japanese nationality was made a matter of record by the entry of his name into his uncle's Family Census Register. He states that this action was taken under severe pressure by the Japanese police and by his uncle, on whom he was financially dependent after his supply of funds from the U. S. was cut off; this office has reason to believe this statement." These representations led to the issuance of an American passport on which he returned to the United States in 1946.

If petitioner were to be believed in December, 1945, he never once renounced his American citizenship. If what petitioner now says were his thoughts, attitudes, and motives in 1943 and 1944 and in part of 1945, he did intend to renounce his American citizenship. If the latter version were believed by the jury, the signing of the family register, and the changing of his registration at the police station and at the University would assume different significance; those acts might then readily suggest the making of a declaration of allegiance to Japan within the meaning of § 401 (b). If, on the other hand, petitioner were to be believed when in 1945 he stated he had not done acts by which he renounced his American citizenship, then the Koseki incident and the changes in his police and University registration could reasonably be taken as amounting to no more than a public declaration of an established and preexisting fact, *viz.* his Japanese

nationality. We think, in other words, that the question whether petitioner had renounced his American citizenship was on this record peculiarly for the jury to determine. The charge was that the jury must be satisfied beyond a reasonable doubt that during the period specified in the indictment, petitioner was an American citizen. We cannot say there was insufficient evidence for that finding.

Petitioner concedes he did not enter the armed services of Japan within the meaning of § 401 (c) of the Act but claims that during his tour of duty at the Oeyama camp he was "serving in" the Japanese armed services within the statutory meaning of those words. In this connection he also argues that his work in the Oeyama camp was the performance of the duties of an "office, post, or employment under the government" of Japan "for which only nationals of such state are eligible" within the meaning of § 401 (d) of the Act.

The Oeyama Nickel Industry Co., Ltd., was a private company, organized for profit. It was engaged in producing metals used for war under contracts with the Japanese government. In 1944 it was designated by the Japanese government as a munitions corporation and under Japanese law civilian employees were not allowed to change or quit their employment without the consent of the government. The company's mine and factory were manned in part by prisoners of war. They lived in a camp controlled by the Japanese army. Though petitioner took orders from the military, he was not a soldier in the armed services; he wore insignia on his uniform distinguishing him as nonmilitary personnel; he had no duties to perform in relation to the prisoners, except those of an interpreter. His employment was as an interpreter for the Oeyama Nickel Industry Co., Ltd., a private company. The regulation of the company by

the Japanese government, the freezing of its labor force, the assignment to it of prisoners of war under military command were incidents of a war economy. But we find no indication that the Oeyama Company was nationalized or its properties seized and operated by the government. The evidence indicates that it was a part of a regimented industry; but it was an organization operating for private profit under private management. We cannot say that petitioner's status as an employee of a private company was changed by that regimentation of the industry.

It would require a broad and loose construction of "office, post, or employment under the government of a foreign state" as those words are used in § 401 (d) to hold that petitioner had sacrificed his American citizenship by accepting or performing the duties of interpreter. We are thinking not only of this case but of other cases to which § 401 (d) is applicable. We are reluctant to resolve the ambiguity contained in § 401 (d) so as to provide treacherous ground for the loss of the rights of citizenship by the Nisei. As the Court said in *Perkins* v. *Elg, supra,* p. 337, "Rights of citizenship are not to be destroyed by an ambiguity." It would be harsh indeed to· hold that a Nisei, marooned in Japan when World War II broke out, would be expatriated merely by working for a private company whose business was supervised and whose labor supply was controlled by the Japanese government in time of war. That would give § 401 (d) a broad, pervasive sweep. Section 401 (d) not only makes acceptance of "any office, post, or employment under the government of a foreign state" the basis of expatriation; it also makes "performing the duties" of any such office, post, or employment a ground for expatriation. One who was drafted for such service would be included, as well as one who volunteered. In time of war that would bring most employees of private companies within the danger

zone in view of the hold which a war economy places on industry and the supervision and control which it asserts. We therefore incline to a construction of the words "under the government of a foreign state" to mean the relationship that public employees have with their government or with the bureaus or corporations which are government owned and controlled. Support for that narrower meaning is found in the legislative history.[3]

---

[3] The explanatory comments on the draft code of the Nationality Laws transmitted with the message of the President on June 13, 1938, stated the following as respects § 401 (c) and (d):

"With reference to subsections (c) and (d) attention is called to the following statement in an opinion of Attorney General Williams, dated August 20, 1873 (14 Op. Atty. Gen. 295, 297):

" 'My opinion . . . is that, in addition to domicile and intent to remain, such expressions or acts as amount to a renunciation of United States citizenship and a willingness to submit to or adopt the obligations of the country in which the person resides, *such as accepting public employment,* engaging in military services, etc., may be treated by this Government as expatriation, without actual naturalization. Naturalization is without doubt the highest, but not the only evidence of expatriation.' " (Italics added.) Codification of the Nationality Laws of the United States, 76th Cong., 1st Sess., House Committee Print, p. 67.

Mr. Flournoy, speaking for the State Department at the hearings (see Hearings on H. R. 6127, H. R. 9980, 76th Cong., 1st Sess., pp. 131–132), described the provision that became § 401 (d) in the following way:

"It seems to me the object of that is fairly clear. A foreign state has *some position in its government* which can be held only by its citizens and *an American accepts such a position* and serves the foreign state and loses his American nationality. That is intended particularly for cases of persons of dual nationality, and there are not a great many of those cases. There are not many thousands of them. . . . This is intended particularly for those cases of dual nationality. Say an American is born here and he goes to and is living in Mexico and *he takes a position in the Mexican Government,* that is regarded as equivalent to a choice of his citizenship and he loses his American nationality." (Italics added.)

Section 402 [4] creates a presumption [5] that a national in Kawakita's category who remains six months or longer within a foreign state of which he or either of his parents shall have been a national shall be presumed to have expatriated himself under § 401 (c) or (d). Section 402 does not enlarge § 401 (c) or (d); it creates a rebuttable presumption of expatriation; and when it is shown that the citizen did no act which brought him under § 401 (c) or (d), the presumption is overcome. On that showing the person never loses his American nationality. See *Dos Reis* v. *Nicolls,* 161 F. 2d 860, 868. In other words, once it was shown that petitioner was not expatriated under § 401 (c) or (d), the force of § 402 was spent.

Section 408 provides, "The loss of nationality under this Act shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this Act." The District Court therefore charged

---

[4] Section 402 reads as follows:

"A national of the United States who was born in the United States or who was born in any place outside of the jurisdiction of the United States of a parent who was born in the United States, shall be presumed to have expatriated himself under subsection (c) or (d) of section 401, when he shall remain for six months or longer within any foreign state of which he or either of his parents shall have been a national according to the laws of such foreign state, or within any place under control of such foreign state, and such presumption shall exist until overcome whether or not the individual has returned to the United States. Such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, or to an immigration officer of the United States, under such rules and regulations as the Department of State and the Department of Justice jointly prescribe. However, no such presumption shall arise with respect to any officer or employee of the United States while serving abroad as such officer or employee, nor to any accompanying member of his family."

[5] Section 402 was adopted "upon the special recommendation of the War Department with a view to checking the activities of persons regarded as prospective 'fifth columnists.'" 86 Cong. Rec. 11948.

the jury that the only methods of expatriation are those contained in § 401. Petitioner claims that charge was error. He argues that § 408 is applicable only to the loss of nationality "under this Act" and that there are other methods of losing it. He refers to R. S. § 1999, 8 U. S. C. § 800, which survived the Nationality Act of 1940 and is not part of it, and which proclaims the right of expatriation as "a natural and inherent right of all people." [6] We do not undertake to resolve the question for the reason that it is not squarely presented. On this issue of expatriation, petitioner tenders no question of fact which was inadmissible under § 401. Petitioner merely says that "by his conduct" he had "expatriated himself from United States citizenship." But he has failed to show that that issue is narrower than or different from the issue presented on this record under § 401 (b)—the declaration of allegiance to Japan. As we have indicated, the major factual problem on the issue of expatriation revolved around the entry of petitioner's name in the Koseki. All of the other conduct referred to, including the paying of respects to the Emperor and the expressions of hostility to the United States, were relevant and admissible on that issue. If it could not in the eyes of the jury make the

---

[6] R. S. § 1999, 8 U. S. C. § 800 provides:

"Whereas the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this Government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof; and whereas it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed: Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic."

signing of the Koseki and the changes in the registration that followed that event tantamount to renunciation under § 401 (b), it hardly could do so standing alone. Hence, if there was error in the charge, it was harmless.

That conclusion is reinforced by another aspect of the case. Petitioner testified that he believed when he signed the Koseki that he lost his American citizenship. He testified that during the period charged in the indictment he believed that he was no longer an American citizen. The District Court charged that if the jury found (1) defendant had committed any overt act charged in the indictment and (2) he was an American citizen, yet they should not convict if they further found that at the time "the defendant honestly believed that he was no longer a citizen of the United States" since in that event he could not have committed the act with treasonable intent. Under this charge the belief of petitioner that he had renounced his American citizenship was sufficient to acquit if the jury believed him. His belief could not have been made more relevant to the issue of guilt if it had been admitted as proof of expatriation separate and apart from the other grounds specified in § 401 of the Act. Hence even if we assume, *arguendo,* that the court was wrong in charging that § 408 made the grounds specified in § 401 exclusive, the error was harmless.

*Second.* Petitioner contends that a person who has a dual nationality can be guilty of treason only to the country where he resides, not to the other country which claims him as a national. More specifically, he maintains that while petitioner resided in Japan he owed his paramount allegiance to that country and was indeed, in the eyes of our law, an alien enemy.

The argument in its broadest reach is that treason against the United States cannot be committed abroad or in enemy territory, at least by an American with a dual nationality residing in the other country which

claims him as a national. The definition of treason, however, contained in the Constitution contains no territorial limitation. "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. . . ." Art. III, § 3. A substitute proposal containing some territorial limitations was rejected by the Constitutional Convention. See 2 Farrand, The Records of the Federal Convention, pp. 347–348. The Act of April 30, 1790, 1 Stat. 112, which was passed by the first Congress defining the crime of treason likewise contained no territorial limitation; and that legislation is contained in substantially the same form in the present statute. 18 U. S. C. (Supp. IV) § 2381.[7] We must therefore reject the suggestion that an American citizen living beyond the territorial limits of the United States may not commit treason against them. See *Chandler* v. *United States,* 171 F. 2d 921, 929–930; *Burgman* v. *United States,* 88 U. S. App. D. C. 184, 185, 188 F. 2d 637, 640.

One who has a dual nationality will be subject to claims from both nations, claims which at times may be competing or conflicting. The nature of those claims has recently been stated as follows:

"A person with dual nationality may be subjected to taxes by both states of which he is a national. He is not entitled to protection by one of the two states of which he is a national while in the territorial jurisdiction of the other. Either state not at war with the other may insist on military service when the person is present within its territory. In time

[7] "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined not less than $10,000; and shall be incapable of holding any office under the United States."

of war if he supports neither belligerent, both may be aggrieved. If he supports one belligerent, the other may be aggrieved. One state may be suspicious of his loyalty to it and subject him to the disabilities of an enemy alien, including sequestration of his property, while the other holds his conduct treasonable." Orfield, The Legal Effects of Dual Nationality, 17 Geo. Wash. L. Rev. 427, 429.

Dual nationality, however, is the unavoidable consequence of the conflicting laws of different countries. See 3 Hackworth, *supra,* pp. 352 *et seq.* One who becomes a citizen of this country by reason of birth retains it, even though by the law of another country he is also a citizen of it. He can under certain circumstances be deprived of his American citizenship through the operation of a treaty or an act of Congress; he can also lose it by voluntary action. See *Perkins* v. *Elg, supra,* p. 329. But American citizenship, until lost, carries obligations of allegiance as well as privileges and benefits. For one who has a dual status the obligations of American citizenship may at times be difficult to discharge. An American who has a dual nationality may find himself in a foreign country when it wages war on us. The very fact that he must make a livelihood there may indirectly help the enemy nation. In these days of total war manpower becomes critical and everyone who can be placed in a productive position increases the strength of the enemy to wage war. Of course, a person caught in that predicament can resolve the conflict of duty by openly electing one nationality or the other and becoming either an alien enemy of the country where he resides or a national of it alone. Yet, so far as the existing law of this country is concerned, he need not make that choice but can continue his dual citizenship. It has been stated in an administrative ruling of the State Department that a person with a dual citizenship who lives abroad in the other country claiming him

as a national owes an allegiance to it which is paramount to the allegiance he owes the United States.[8] That is a far cry from a ruling that a citizen in that position owes no allegiance to the United States. Of course, an American citizen who is also a Japanese national living in Japan has obligations to Japan necessitated by his residence there. There might conceivably be cases where the mere nonperformance of the acts complained of would be a breach of Japanese law. He may have employment which requires him to perform certain acts. The compulsion may come from the fact that he is drafted for the job or that his conduct is demanded by the laws of Japan. He may be coerced by his employer or supervisor or by the force of circumstances to do things which he has no desire or heart to do. That was one of petitioner's defenses in this case. Such acts—if done voluntarily and willfully—might be treasonable. But if done under the compulsion of the job or the law or some other influence, those acts would not rise to the gravity of that offense. The trial judge recognized the distinction in his charge when he instructed the jury to acquit petitioner if he did not do the acts willingly or voluntarily "but so acted only because performance of the duties of his employment required him to do so or because of other coercion or compulsion." In short, petitioner was held accountable by the jury only for performing acts of hostility toward this country which he was not required by Japan to perform.

If he can retain that freedom and still remain an American citizen, there is not even a minimum of allegiance which he owes to the United States while he resides in the enemy country. That conclusion is hostile to the concept of citizenship as we know it, and it must be rejected. One who wants that freedom can get it by

---

[8] Abstract of Passport Laws and Precedents, Passport Division Office Instructions, Code No. 1.6, May 19, 1941.

renouncing his American citizenship. He cannot turn it into a fair-weather citizenship, retaining it for possible contingent benefits but meanwhile playing the part of the traitor. An American citizen owes allegiance to the United States wherever he may reside.

Circumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship. An American with a dual nationality who is charged with playing the role of the traitor may defend by showing that force or coercion compelled such conduct. The jury rejected that version of the facts which petitioner tendered. He is therefore forced to maintain that, being a national and a resident of Japan, he owed no allegiance to the United States even though he was an American citizen. That proposition we reject.

*Third.* Article III, § 3 of the Constitution provides, "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

So far as material here, the crime thus consists of two elements—adhering to the enemy; and giving him aid and comfort. See *Cramer v. United States,* 325 U. S. 1, 29. One may think disloyal thoughts and have his heart on the side of the enemy. Yet if he commits no act giving aid and comfort to the enemy, he is not guilty of treason. He may on the other hand commit acts which do give aid and comfort to the enemy and yet not be guilty of treason, as for example where he acts impulsively with no intent to betray. Two witnesses are required not to the disloyal and treacherous intention but to the same overt act. See *Cramer v. United States, supra,* pp. 30, 31.

The jury found petitioner guilty of eight overt acts.[9] One overt act alone, properly proved, would be sufficient to sustain the conviction, all other elements of the crime of treason being established. Since the jury returned special verdicts and findings as to each of the eight overt acts, we could not upset the judgment of conviction, unless all eight were insufficient. See *Haupt* v. *United States*, 330 U. S. 631, 641. We conclude, however, that each of the eight overt acts was properly proved.

Each of these related to his treatment of American prisoners of war at the Oeyama camp. These prisoners were mostly from Bataan and were in weakened condition on their arrival. All were below normal weight; many of them were suffering from disease; most of them were unfit for work. They were assigned to work either in the factory or at the mine of the Oeyama Company. They were under the supervision of the Japanese army. Petitioner was a civilian interpreter, as we have said. There was evidence that he had no authority and no duties, as respects the prisoners, except as an interpreter. Yet the record shows a long, persistent, and continuous course of conduct directed against the American prisoners and going beyond any conceivable duty of an interpreter.

After the American prisoners arrived, the Japanese authorities raised the quota of ore which they were expected to produce each day. The quota had been between 120 and 165 carloads a day; now it was increased to 200. A part of petitioner's conduct was swearing at the prisoners, beating them, threatening them, and punishing them for not working faster and harder, for failing to fill their quotas, for resting, and for slowing down.

There were two overts acts in this category. Overt act (a) as alleged in the indictment and developed at the

---

[9] The form of interrogatory which the jury answered affirmatively to each of the eight overt acts is printed in *United States* v. *Kawakita*, 96 F. Supp. 824, 851–852.

trial was that in May, 1945, petitioner kicked a prisoner named Toland who was ill, because he slowed down in lifting pieces of ore rocks from the tracks at the factory to keep the tracks clear. Toland had suffered a dizzy spell and slowed down. Petitioner told him to get to work and thereupon kicked him, causing him to fall flat and to cut his face and hand. Another prisoner wanted to pick Toland up; but petitioner would not let him. Overt act (j) as alleged in the indictment and developed at the trial was that in May, 1945, petitioner struck a prisoner named Armellino, who was weak and emaciated, in order to make him carry more lead. Armellino had been carrying only one bucket of lead. Petitioner thereupon struck him, causing him to fall. When he got up, petitioner forced him to carry two buckets, pushing him along.

Each of these acts was aimed at getting more work out of the prisoners—work that produced munitions of war for the enemy, or so the jury might have concluded. The increased efforts charged in overt acts (a) and (j) were small; the contribution to the war effort of the enemy certainly was minor, not crucial. Harboring the spy in *Haupt* v. *United States, supra,* was also insignificant in the total war effort of Germany during the recent war. Yet it was a treasonable act. It is the nature of the act that is important. The act may be unnecessary to a successful completion of the enemy's project; it may be an abortive attempt; it may in the sum total of the enemy's effort be a casual and unimportant step. But if it gives aid and comfort to the enemy at the immediate moment of its performance, it qualifies as an overt act within the constitutional standard of treason. As Chief Justice Marshall said in *Ex parte Bollman,* 4 Cranch 75, 126, "If war be actually levied, . . . all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general

conspiracy, are to be considered as traitors." These two overt acts, if designed to speed up Japan's war production, plainly gave aid and comfort to the enemy in the constitutional sense.

The other overt acts were acts of cruelty to American prisoners of war.

Overt act (b) as alleged in the indictment and developed at the trial was that one Grant, an American prisoner, had been seen by a Japanese sentry coming out of the Red Cross storeroom with a package of cigarettes. He was thereupon thrown into a cesspool by a Japanese sergeant, ordered out, and knocked back repeatedly. While Grant was in the cesspool, petitioner hit him over the head with a wooden pole or sword, told him to squat down, and tried to force him to sit in the water. When Grant was taken from the pool, he was blue, his teeth were chattering, and he could not straighten up.

Overt act (c) as alleged in the indictment and developed at the trial was that in December, 1944, petitioner and Japanese guards lined up about 30 American prisoners and, as punishment for making articles of clothing out of blankets, struck them and forced them to strike each other. Petitioner hit prisoners who, he thought, did not hit each other hard enough.

Overt act (d) as alleged in the indictment and developed at the trial was that petitioner imposed cruelty on O'Connor, an American prisoner, who was sick and had stolen Red Cross supplies. He was knocked into the cesspool by Japanese soldiers and then repeatedly hit and thrown back into the pool by them and by petitioner, with the result that O'Connor temporarily lost his reason.

Overt act (g) as alleged in the indictment and developed at the trial was that in July or August, 1945, a Japanese sergeant compelled a work detail of American prisoners, who had returned early, to run around a quadrangle. Petitioner forced two of the Americans, who

were unable to run fast because of illness, to run the course an additional four and six times respectively. Petitioner threw pebbles and sod at them to make them run faster.

Overt act (i) as alleged in the indictment and developed at the trial was that in December, 1944, petitioner ordered one Carter, an American prisoner of war, to carry a heavy log up an ice-covered slope at the mine. When Carter slipped, fell, and was injured, petitioner although he knew Carter was badly hurt and needed attention delayed his removal back to camp for approximately five hours.

Overt act (k) as alleged in the indictment and developed at the trial was that in the spring or summer of 1945 petitioner participated in the inhuman punishment of one Shaffer, an American prisoner of war. Shaffer was forced to kneel on bamboo sticks on a platform with a bamboo stick inside the joints of his knees, and to keep his arms above his head holding a bucket of water and later a log. When Shaffer became tired and bent his elbows, petitioner would strike him. When Shaffer leaned over and spilled some water, petitioner would take the bucket, throw the water on Shaffer, and have the bucket refilled. Then Shaffer was required to hold up a log. It fell on him, causing a gash. After the wound was treated, petitioner placed bamboo sticks on the ground and once more made Shaffer kneel on them and go through the same performance.

As we have said, petitioner was not required by his employment to inflict punishment on the prisoners. His duties regarding the prisoners related solely to the role of interpreter. His acts of cruelty toward the prisoners were over and beyond the call of duty of his job, or so the jury might have found. We cannot say as a matter of law that petitioner did these acts under compulsion. He seeks, however, to find protection under Japanese municipal law. It is difficult to see how that argument helps

petitioner. The source of the law of treason is the Constitution. If an American citizen is a traitor by the constitutional definition, he gains no immunity because the same acts may have been unlawful under the law of the country where the acts were performed. Treason is a separate offense; treason can be committed by one who scrupulously observes the laws of other nations; and his acts may be nonetheless treasonable though the same conduct amounts to a different crime. It would take a long chapter to relate the numerous acts that supplement the crime of treason and build different and lesser crimes out of the same or related acts. See *Cramer* v. *United States, supra,* p. 45. But no matter the reach of the legislative power in defining other crimes, the constitutional requirements for treason remain the same. The crime of treason can be taken out of the Constitution by the processes of amendment; but there is no other way to modify or alter it.

The jury found that each of the six overt acts of cruelty actually gave aid and comfort to the enemy. We agree. These were not acts innocent and commonplace in appearance and gaining treasonable significance only by reference to other evidence, as in *Cramer* v. *United States, supra.* They were acts which showed more than sympathy with the enemy, more than a lack of zeal in the American cause, more than a breaking of allegiance to the United States. They showed conduct which actually promoted the cause of the enemy. They were acts which tended to strengthen the enemy and advance its interests. These acts in their setting would help make all the prisoners fearful, docile, and subservient. Because of these punishments the prisoners would be less likely to be troublesome; they would need fewer guards; they would require less watching. These acts would tend to give the enemy the "heart and courage to go on with the war." That was the test laid down by Lord Chief Justice Treby

in Trial of Captain Vaughan, 13 How. St. Tr. 485, 533. It is a sufficient measure of the overt act required by the Constitution. *Cramer* v. *United States, supra,* pp. 28, 29, 34. All of the overt acts tended to strengthen Japan's war efforts; all of them encouraged the enemy and advanced its interests.

Petitioner contends that the overt acts were not sufficiently proved by two witnesses. Each witness who testified to an overt act was, however, an eye-witness of the commission of that act. They were present and saw or heard that to which they testified. In some instances there was a variance as to details. Thus overt act (b) was testified to by thirteen witnesses. They did not all agree as to the exact date when the overt act occurred, whether in April, May, or June, 1945. But they all agreed that it did take place, that Grant was the victim, and that it happened between 3 and 6 o'clock in the afternoon; and most of them agreed that petitioner struck Grant. The Court of Appeals concluded, and we agree, that the disagreement among the witnesses was not on what took place but on collateral details. "While two witnesses must testify to the same act, it is not required that their testimony be identical." *Haupt* v. *United States, supra,* p. 640. There is no doubt that as respects each of the eight overt acts the witnesses were all talking about the same incident and were describing the same conduct on petitioner's part.

*Fourth.* Petitioner challenges the sufficiency of the evidence to show the second element in the crime of treason—adhering to the enemy. The two-witness requirement does not extend to this element. *Cramer* v. *United States, supra,* p. 31. Intent to betray must be inferred from conduct. It may be inferred from the overt acts themselves (*Cramer* v. *United States, supra,* p. 31), from the defendant's own statements of his attitudes toward

the war effort (*Haupt* v. *United States, supra,* p. 642), and from his own professions of loyalty to Japan.

Evidence of what petitioner said during this period concerning the war effort and his professions of loyalty, if believed by the jury, leaves little doubt of his traitorous intent. "It looks like MacArthur took a run-out powder on you boys"; "The Japanese were a little superior to your American soldiers"; "You Americans don't have no chance. We will win the war." "Well, you guys needn't be interested in when the war will be over because you won't go back; you will stay here and work. I will go back to the States because I am an American citizen"; "We will kill all you prisoners right here anyway, whether you win the war or lose it. You will never get to go back to the States"; "I will be glad when all of the Americans is dead, and then I can go home and live happy." These are some of the statements petitioner made aligning himself with the Japanese cause. There was also evidence that he said that the prisoners would never go back to their wives and their families, that Japan would win the war and that he would return to the United States as an important man, that Japan would win if it took 100 years, that the Japanese were superior to the Americans and if the American Army had Japanese officers, they could whip the world, that there were more American boys who would be available to do the work, if the present prisoners were too weak to work. And on the day the work at the camp ended after Japan surrendered he commented, "You American bastards will be well fed" or "you will be getting fat from now on."

There was evidence that in May or June, 1945, petitioner said, "It don't make a damn to me which way the war goes because I am going back to the States anyway." At the trial he said he felt no loyalty to the United States during the period from March 1943 to December 1945,

and that he intended to do everything he could to help Japan. He also testified that the first loyalty he felt to the United States, following the entry of his name in the Koseki, was when he applied for registration as an American citizen in December, 1945, and once more took the oath of allegiance. Yet we have already seen that in connection with that application he conceded his dual nationality and the continuance of his American citizenship during his entire stay in Japan.

If the versions of petitioner's words and conduct at the Oeyama camp, testified to by the various witnesses, were believed, the traitorous intent would be shown by overwhelming evidence. Petitioner indeed conceded at the trial that he felt no loyalty to the United States at this time and had thrown his lot in with Japan. Yet at the end of the war he had taken the oath of allegiance to the United States, claiming he had been a United States citizen all along. The issue of intent to betray, like the citizenship issue, was plainly one for the jury to decide. We would have to reject all the evidence adverse to petitioner and accept as the truth his protestations when the shadow of the hangman's noose was on him in order to save him from the finding that he did have the intent to betray. That finding of the jury was based on its conclusion that what he did was done willingly and voluntarily and not because the duty of his office or any coercion compelled him to do it. The finding that he had an uncoerced and voluntary purpose was amply supported by the evidence. Therefore the second element of the crime of treason was firmly established.

Other alleged errors are pressed upon us. But they are either insubstantial or so adequately disposed of by the Court of Appeals that we give them no notice, with one exception and that relates to the severity of the sentence. At the time of these offenses Congress had provided that one who is guilty of treason "shall suffer death; or, at

the discretion of the court, shall be imprisoned not less than five years and fined not less than $10,000, . . . and every person so convicted of treason shall, moreover, be incapable of holding any office under the United States." [10] The trial judge imposed the death sentence. The argument is that that sentence was so severe as to be arbitrary. It was, however, within the statutory limits. Whether a sentence may be so severe and the offense so trivial that an appellate court should set it aside is a question we need not reach. The flagrant and persistent acts of petitioner gave the trial judge such a leeway in reaching a decision on the sentence that we would not be warranted in interfering. Cf. *Blockburger* v. *United States*, 284 U. S. 299, 305.

*Affirmed.*

MR. JUSTICE FRANKFURTER, not having heard the argument, owing to illness, took no part in the disposition of the case.

MR. JUSTICE CLARK took no part in the consideration or decision of the case.

MR. CHIEF JUSTICE VINSON, with whom MR. JUSTICE BLACK and MR. JUSTICE BURTON join, dissenting.

The threshold question in this case is whether petitioner renounced his United States citizenship and became expatriated by reason of acts committed in Japan during the War. Prior to 1943, petitioner was regarded by Japanese authorities as an enemy alien. In March, 1943, petitioner gave official notice of his allegiance to Japan by having his name registered in the family Koseki. Thereafter, petitioner had his name removed from police

---

[10] 18 U. S. C. (1946 ed.) § 2. For the present version see note 7, *supra.*

records as an enemy alien, secured employment subject to military control at a munitions plant, traveled to China on a Japanese passport, and prayed daily for the Emperor's health and a Japanese victory. These facts and petitioner's heinous treatment of American prisoners of war, recited in the opinion of the Court, convince us that petitioner, for over two years, was consistently demonstrating his allegiance to Japan, not the United States. As a matter of law, he expatriated himself as well as that can be done.

Petitioner's statements that he was still a citizen of the United States—made in order to obtain a United States passport after Japan had lost the War—cannot restore citizenship renounced during the War. Because we conclude, on this record, that petitioner's whole course of conduct was inconsistent with retention of United States citizenship, we would reverse petitioner's conviction of treason against the United States.